Filed: October 7, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-1242

Sons of Confederate Veterans, etc., et al.,

Plaintiffs - Appellees,

versus

Commissioner of the Virginia Department of
Motor Vehicles, etc.,

Defendant - Appellant.

O R D E R

The court amends its order on rehearing filed September 20, 2002, as follows:

On page 6, first full paragraph, line 5 -- the extra "the" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SONS OF CONFEDERATE VETERANS,
INCORPORATED, a Tennessee
Corporation, by its Commander-in-
Chief Patrick J. Griffin; VIRGINIA
DIVISION OF SONS OF CONFEDERATE
VETERANS, INCORPORATED, a Virginia
Corporation, by its Commander
Robert W. Barbour, Sr.,
     *Plaintiffs-Appellees,*

    v.

COMMISSIONER OF THE VIRGINIA
DEPARTMENT OF MOTOR VEHICLES, in
his official capacity,               No. 01-1242
     *Defendant-Appellant,*

    and

COMMONWEALTH OF VIRGINIA, whose
agents and officers enacted and will
enforce, on its behalf, VA. CODE
ANN. 46.2-746.22; JAMES S.
GILMORE, III, as Governor of the
Commonwealth of Virginia, in his
official capacity; SHIRLEY YBARRA,
as Secretary of the Department of
Transportation of the State of
Virginia, in her official capacity,
     *Defendants.*

Filed September 20, 2002

---

**ORDER**

   Upon a request for a poll of the court on rehearing en banc, the
court denies rehearing. Judges Niemeyer, Michael, Motz, King, and

Gregory voted for rehearing en banc. Chief Judge Wilkinson and Judges Widener, Wilkins, Luttig, Williams, and Traxler voted to deny rehearing en banc. Chief Judge Wilkinson and Judge Williams wrote separate opinions concurring in the denial of rehearing en banc. Judge Luttig wrote a separate opinion respecting the denial of rehearing en banc. Judge Niemeyer and Judge Gregory wrote separate opinions dissenting from the denial of rehearing en banc.

FOR THE COURT

_____
Clerk

WILKINSON, Chief Judge, concurring in the denial of rehearing en banc:

The closeness of the court's vote (6 to 5) leads me to explain my own. I concur in the denial of rehearing en banc because the legislative action here seems to me to violate basic First Amendment principles. The Virginia General Assembly has approved over one hundred special plates, and the statute authorizing the SCV special plate is the only one with design and logo restrictions. When a legislative majority singles out a minority viewpoint in such pointed fashion, free speech values cannot help but be implicated. And it is as a free speech case, not as a Confederate flag case, that this appeal must be resolved.

It is important to keep the issue here in some perspective. The vast majority of Virginians have no desire to display a Confederate logo on their license plates. The vast majority of Virginians seek venues other than a motor vehicle tag for the observance of their lineage, and do not view the Confederate flag as symbolically celebrating their line of descent. The vast majority of Virginians understand that one motorist's proclamation of heritage is another's reminder of the unspeakable cruelties of human bondage. The vast majority of Virginians recognize the sad paradox of Confederate history — namely, that individual southerners, so many good and decent in themselves, swore allegiance to a cause that thankfully was lost, and to practices that no society should have sought to defend.

But the First Amendment was not written for the vast majority of Virginians. It belongs to a single minority of one. It is easy enough

2

for us as judges to uphold expression with which we personally agree, or speech we know will meet with general approbation. Yet pleasing speech is not the kind that needs protection.

Our Constitution safeguards contrarian speech for several reasons. As the Civil Rights Movement demonstrates, yesterday's protest can become tomorrow's law and wisdom. Other contrarian speech should move popular majorities to reaffirm their own beliefs rather than suppress those of others. The reminders of history's most tragic errors only deepen our commitment to the dignity of all citizens: The Constitution that houses the First Amendment also shelters the Fourteenth, an everlasting reminder that a nation betrothed to liberty and equal justice under law must remain vigilant to realize both.

WILLIAMS, Circuit Judge, concurring in the denial of rehearing en banc:

There can be no doubt that the symbol desired by the SCV on their special plate is a controversial and divisive one. But as Chief Judge Wilkinson points out, this case must be resolved "as a free speech case, not as a Confederate flag case." *Ante* at 2. In essence, the Commonwealth has opened its license plates to myriad private speakers but wishes to restrict the message one of those speakers would express based on its disagreement with the viewpoint contained therein; this the First Amendment does not permit. I undertake herein to respond briefly to several points raised in the separate opinions of my colleagues respecting and dissenting from the denial of rehearing en banc.

My first dissenting colleague suggests that what is at issue here is pure government speech. For the reasons stated in the panel opinion, I disagree. I will respond here only to the suggestion that the Supreme Court's opinion in *Wooley v. Maynard*, 430 U.S. 705 (1977), compels the conclusion that government speech is at issue. As my first dissenting colleague notes, the Supreme Court in *Wooley* found the requirement that New Hampshire drivers display license plates bearing the slogan "Live Free or Die" to be impermissible because it forced the complaining driver "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley*, 430 U.S. at 715. My colleague thus concludes "that license plates are

3

the State's speech." *Post* at 15. I believe this conclusion misapprehends *Wooley*'s significance in this case. *Wooley* rested on the proposition "that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714. The complainant's First Amendment interests were implicated in *Wooley* because the message in question, displayed on his license plate, would be attributed to him. That the message the state created and required to be displayed on all plates — "Live Free or Die" — was the state's message is not a necessary component of *Wooley*'s holding. One might reason, of course, as my first dissenting colleague appears to, that if the driver is compelled to speak, the message must be the state's, and therefore anything on a license plate, under any circumstances, is government speech. Nowhere in *Wooley*, however, did the Court suggest this was the case; the only speech interest identified in *Wooley* was that of the driver. More significantly, the facts in *Wooley* indicate that even if the Supreme Court concluded that the state was the speaker, that conclusion would not control this case. In stark contrast to the situation in *Wooley*, where the same state slogan was required on nearly all license plates, the various mottos and logos on most special plates in Virginia are created and selected by drivers themselves.

As to the concerns expressed in my second dissenting colleague's opinion, I believe that they, too, are ultimately unpersuasive. My second dissenting colleague suggests that the the speech in question here is not easily placed on either side of the "blurry and sometimes overlapping line between private and government speech," *post* at 17, and that the test employed in the panel opinion for determining whether the government is the speaker was applied in a manner that did not adequately address the Commonwealth's interest in avoiding attribution of the logo's message to the Commonwealth.

As to the first concern, I believe that *Wooley* is again instructive. I note that my colleague identifies as unpersuasive the panel opinion's conclusion "that the private citizen bears the`ultimate responsibility' for the speech" on Virginia's special plates, suggesting that this factor "may very well be a key to the case." *Post* at 17 n.2. The Supreme Court in *Wooley*, however, apparently concluded that the message on New Hampshire's plate would be attributed *to the driver*, a conclu-

4

sion strongly indicated by the success of the complaining driver's First Amendment claim. If the message or slogan on a license plate is ultimately attributable to the state that issues the plate, as both of my dissenting colleagues suggest, then the First Amendment claim in *Wooley* ought to have foundered for failure to implicate individual speech rights.

Indeed, the proposition that the state is ultimately responsible for the license plate message in question is weaker here than it was in *Wooley*. In *Wooley*, the slogan in question was required on all non-commercial New Hampshire plates, a fact presumably apparent to anyone driving in New Hampshire. 430 U.S. at 705. Individual drivers thus had no control over the content of their license plates. Here, in contrast, numerous messages, crafted and selected by the drivers themselves, appear on Virginia's special plates. Plainly, anyone viewing a license plate bearing a motto or logo the viewer knows to have been selected by the driver or owner of the vehicle is more likely to associate the message with that driver or owner than would be the viewer of a state-mandated logo appearing on all noncommercial plates across the state.*

My colleague writing respecting the denial of rehearing en banc suggests that the panel opinion and the various opinions concurring in and dissenting from the denial of rehearing en banc "focus[ ] on the license plate as a whole in their respective analyses." *Post* at 7. I do not believe that either the panel opinion or this opinion suggests that any part of the SCV special plate's design other than the motto and logo implicates private speech interests. Further, whatever the merits

---

*My second dissenting colleague concludes, as I understand his opinion, that the government's interest in avoiding having a message that it finds distasteful attributed to it justifies treating the logo restriction as a time, place, and manner restriction. A time, place, and manner restriction, however, must be "justified without reference to the content of the regulated speech," a test the logo restriction surely fails. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The Commonwealth, as the panel opinion notes, has offered no justification for the restriction in this case unrelated to the content of the logo it prohibits. *See Sons of Confederate Veterans v. Commissioner of the Va. Dep't of Motor Vehicles*, 288 F.3d 610, 626 & n.14 (4th Cir. 2002).

of my colleague's suggestion that there is a government speech interest in (as distinct from a government interest in regulating) the content of the motto and logo appearing on a special plate, it seems to me that we do not differ substantially in our views that the private speech interests implicated by the motto and logo must prevail in this circumstance over any countervailing interest the government may have.

In sum, I believe that the government-speech issue in this case was correctly decided and that rehearing en banc was appropriately denied. Neither party in this case was sufficiently concerned by the narrowly written panel opinion, centered on the unique factual circumstances of the logo restriction and the special plate program, to seek en banc rehearing, and the number of my colleagues who would have been willing to rehear this case en banc does not constitute the majority required by Fed. R. App. Proc. 35(a) (stating that a majority of judges in regular active service may order en banc review). Moreover, through their separate opinions, my colleagues have presented their views of the issues.

LUTTIG, Circuit Judge, respecting the denial of rehearing en banc:

As have the other circuit courts that have addressed like issues, my colleagues have struggled with this case because they have assumed, in oversimplification, that all speech must be either that of a private individual or that of the government, and that a speech event cannot be *both* private and governmental at the same time. In their collective defense, our court and our sister circuits have all so assumed because, to this point, the Supreme Court has always held that speech is either private or governmental, and it has never held that a message can be both that of a private individual and that of the government. However, the "government speech" doctrine is still in its formative stages, and, as yet, it is neither extensively nor finely developed. And I believe that it is as a consequence of this doctrinal underdevelopment that my colleagues find themselves, at the same time, analytically unsatisfied but insistent upon polar opposite conclusions with respect to what seemingly should be a simple answer to a straightforward question.

However, in the underdevelopment of the "government speech" doctrine lies not only the source of the confusion, but also the simple

answer — recognition that, although the doctrine may not have previously recognized such, speech in fact can be, at once, that of a private individual and the government. Although the Supreme Court could ultimately choose either to ignore or to refuse to recognize this descriptive fact because of sheer practical considerations, I believe that, with time, intellectual candor actually will force the Court instead to fully recognize this fact doctrinally.

When the Supreme Court is finally confronted with the case in which this elaboration upon its "government speech" doctrine is compelled, I am convinced that our court in turn will, upon reflection, conclude that at least the particular speech at issue in this case is neither exclusively that of the private individual nor exclusively that of the government, but, rather, hybrid speech of both. Indeed, as I have thought about the matter, I believe that the speech that appears on the so-called "special" or "vanity" license plate could prove to be the quintessential example of speech that is both private and governmental because the forum and the message are essentially inseparable, the consequence being that it is difficult if not impossible to separate sufficiently what is indisputably the speech act by the private speaker from what is equally indisputably the speech act by the government.

While all of my colleagues have focused on the license plate as a whole in their respective analyses, this aspect of their analyses is, too, overly simplistic. It causes the one side of the debate to conclude, unconvincingly, that the special plate is entirely private speech (merely because it is a "special" plate), and it causes the other to conclude, no less unconvincingly, that there is no private speech at all within the four corners of the license plate (because, and simply because, the government owns and controls the plate).

In truth, of course, when one focuses properly on the particular speech in question here — only the background of the special license plate in question, which comprises the words "Sons of Confederate Veterans" and the confederate flag logo — it is (to borrow Judge Niemeyer's phrase in support of a quite different position from his) "impossible to avoid the conclusion" that not only the government, but also the private individual who displays the license plate on his vehicle, communicates via this speech.

7

Even if it is only a relatively small feature of the overall identification package, the specially-authorized background is no less a feature of the government's internal and external identification of the vehicle, and therefore is government speech. And this is even putting aside the facts that the government owns the license plate in perpetuity and authorizes all special plates legislatively, and that there is always at least some risk that the background message will be wrongly attributed to the government.

But it is equally clear that the requested background is also (indeed, it would appear even more so) the private speech of the individual owner of the vehicle. When a special license plate is purchased, it is really the private citizen who engages the government to publish *his* message, not the government who engages the private individual to publish *its* message, as in cases like *Rust* v. *Sullivan*, 500 U.S. 173 (1991), and *Wooley* v. *Maynard*, for example. Indeed "but for" the private organization's and the private individual's action, the special license plate would not even exist; the private organization must request that a special plate be made and propose its design, and private individuals must request that they be issued such a plate and pay for it over and above the cost exacted for a standard license plate. And if the government has any nonpecuniary interest in the public identification of individual vehicles with particular private organizations, it is minimal.

It was doubtless out of recognition of these facts that the Supreme Court as much as held in *Wooley* v. *Maynard*, 430 U.S. 705 (1977), that even license plate speech that is *compelled* by the government implicates private speech rights, as Judge Williams correctly observes in dismissal of Judge Niemeyer's contrary inference that *Wooley* stands for precisely the opposite proposition. *A fortiori* must it be the case that speech placed on a license plate by the government for a fee at the request of a private organization or individual is at a minimum *partly* the private speech of that organization or individual.

No one, upon careful consideration, would contend that, simply because the government owns and controls the forum, all speech that takes place in that forum is necessarily and exclusively government speech. Such would mean that even speech by private individuals in traditional public fora is government speech, which is obviously not

8

the case. While I suppose it is arguable that where the government totally funds private speakers to convey a government message, the speech of those private individuals is necessarily government speech (and the Supreme Court has so held), this is certainly not the case where, as here, the government voluntarily opens to the public at large, for the purpose of designated speech, property that the private individual is not merely entitled to access, but actually required to display. If this were not self-evident, it should be beyond debate after *Wooley*. And in fact, not even Judge Niemeyer, though he inconsistently concludes otherwise, can help but acknowledge that private, as well as government, speech is implicated in a circumstance such as this: "The fact that the licensee also speaks by choosing to display a customized but authorized version of the license plate does not change the fact that the license plate itself was the issue of the State and therefore constitutes government speech." *Post* at 15-16 (Niemeyer, J., dissenting from denial of rehearing *en banc*).

Of course, because the Supreme Court has yet to recognize that speech can be both private and governmental at the same time, one cannot be certain of the regulatory limitations that the Court will fashion once it limits the government speech doctrine to recognize that some speech hitherto deemed to be exclusively that of the government is, inescapably, also private speech. But without even attempting to foretell those limitations here, I think it is fair to assume that, at least where the government has voluntarily opened up for private expression property that the private individual is actually required by the government to display publicly; the private speech component of the particular communication is significant (whether or not it is significant in comparison to the government's like speech component in that communication); and the government's interest in its speech component is less than compelling, the government will be forbidden from engaging in viewpoint discrimination among the various private speakers who avail themselves of the government's offer.

It is on the twin understandings outlined above — namely, that the speech at issue in this case is both private and governmental in character (and actually, I believe, more the former), and that at a minimum therefore the government may not engage in viewpoint discrimination among those wishing to display the design of their organization as the background for their license plates — that I do not

9

believe that this case warrants further consideration by the full court, *at least in the absence of a petition for rehearing en banc by either party to the litigation*. For, given the view that I have stated herein that the speech at issue is hybrid in nature, not exclusively private, and the votes of those Members of our court who would rehear this case *en banc*, it is unlikely that there is a majority of our court that believes that the speech at issue in this case is purely private. Thus, the conclusion reached by the panel on the threshold, and concededly important, issue of whether private or government speech is at issue does not appear (and certainly does not appear necessarily) to represent the final, considered judgment of the Circuit.

In addition, if I am correct that, at the end of the day in this case, the government is yet prohibited from engaging in viewpoint discrimination, then the panel will have ultimately applied the correct standard to the government's regulatory action, and I do not believe that its conclusion after application of that standard to the specific facts here is particularly worthy of full court review. This is so, especially given that the panel's conclusion on this issue was narrow in scope, limited to the single statute in question, and the imposed prohibition therein, which in turn was limited to the single organization Sons of Confederate Veterans. And, even still, the panel's conclusion rested in large part on an explicit representation by the Commonwealth Commissioner that the purpose of the statute was in fact to ban the confederate flag from the special plate authorized for that particular organization.

This is not to say, it seems clear to me, that the panel decision is, in either fact or effect, beyond further consideration. It is to say, rather, that should there arise a case where license plate speech is again implicated, and where either the government's speech component is at least greater if not compelling (for example where at issue are the actual identifying numbers and letters that appear on all license plates), or where there is reason to believe that the government has, in this limited public or nonpublic forum engaged in no more than content discrimination in furtherance of and consistent with the purposes of the forum (or at least credibly argues such), there will be ample opportunity for the full court to revisit the important issues resolved by the panel.

10

NIEMEYER, Circuit Judge, dissenting from the denial of rehearing *en banc*:

This case presents the important First Amendment issue of whether a State may regulate and control the content included on state-issued and state-owned license plates. Whether license-plate content is government speech has never been decided by our court, and the appropriate analysis is not clearly indicated by any Supreme Court precedent. Moreover, the two other circuits that have reviewed license plate speech have taken different analytical courses. *Compare Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001) (holding that State owned license plate *is a nonpublic forum* entitling the State to deny a license plate with "SHTHPNS" (referring to "Shit Happens") on it as a reasonable and viewpoint-neutral regulation), *with Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2001) (concluding that whether the forum is *nonpublic or public is irrelevant* because the State, in rejecting "ARYAN 1," operated under an unconstitutionally overbroad regulation that violated the First Amendment). Coupled with the virtually even split within our court (6-5) to deny rehearing *en banc* it appears clear that this case presents an unsettled issue of First Amendment law that should have been heard *en banc*.

The specific question presented is whether the Commonwealth of Virginia can refuse to include a Confederate Flag logo on the face of a special license plate, authorized for issuance to members of the Sons of Confederate Veterans. Virginia authorized the issuance of the special license plates commemorating that organization but denied the organization's request to include the Confederate Flag logo as part of the plate's design. The Confederate Flag, while appreciated by an organization commemorating the bravery of Civil War veterans as a symbol of honor, is at the same time a racially hostile symbol to a large segment of Virginia's citizens insofar as the Civil War included a fight to preserve slavery. Nevertheless, the district court concluded that Virginia's denial of the Sons of Confederate Veterans' request to include the Confederate Flag logo was a restriction on speech that violated the First Amendment and accordingly struck down that portion of Virginia's law, essentially mandating that Virginia include the logo on the special plates. Because this issue is important not only to Virginia but also to the right of all States to regulate the issuance and

11

content of their license plates, I submit it is worthy of our *en banc* review.

No one takes issue with the fact that Virginia has an important right and responsibility to regulate motor vehicles and that essential to this regulatory effort is the issuance of license plates evidencing the registration of the vehicle and its compliance with safety and insurance requirements. *See generally* Va. Code Ann. §§ 46.2-701; -707; -708; -709; -712. Because license plates serve an essential function for the public health, safety, and welfare, Virginia retains an inherent and important right to control the plates and their content.

In order to retain control over this regulatory scheme, Virginia manufactures its license plates, issues them to licensees in accordance with strict regulations and requirements for their display, and reserves the continuous right to revoke or recall them. *See id.* §§ 46.2-709; -712; -713; -715; -716. Furthermore, Virginia expressly retains title to all State-issued license plates, asserting that they may be repossessed by the Department of Motor Vehicles at any time as provided by statute. *Id.* §§ 46.2-713; -709. And consistent with this control, Virginia directs that no person may alter the content of a license plate issued by the State or display a license plate that has been altered. *See id.* § 46.2-722.

In addition to the role license plates serve in protecting public health, safety, and welfare, the issuance of license plates produces revenue that is used to pay for the administration of automobile registration and to support the uninsured motorist fund. *See id.* § 46.2-710. To increase those revenues (and to honor certain organizations), the State permits the Department of Motor Vehicles to issue customized license plates and special license plates identifying specific groups, *if* such plates are authorized by the legislature. *See id.* §§ 46.2-725; -726.

One of the special plates authorized by the Virginia legislature is for members of the Sons of Confederate Veterans. *Id.* § 46.2-746.22. The authorizing statute provides:

> On receipt of an application therefor and written evidence that the applicant is a member of the Sons of Confederate

12

> Veterans, the Commissioner shall issue special license plates to members of the Sons of Confederate Veterans. No logo or emblem of any description shall be displayed or incorporated into the design of license plates issued under this section.

*Id.* The text of this provision thus authorizes a special license plate honoring the Sons of Confederate Veterans, but indicates that the plate may not display the Confederate Flag logo, or any other logo for that matter.

The State may rationally have concluded that, despite the perception of the Confederate Flag by some as an emblem of honor, to issue a license plate with the Confederate Flag logo on it would distress African Americans and many others in the State. The State, however, has not taken a position on this controversial symbol; rather, it has removed itself from the fray, simply refusing to authorize the Confederate Flag logo on license plates issued by it. In doing so, of course, Virginia has not prohibited any citizen from displaying the Confederate Flag logo on his or her vehicle. Rather, the State has only indicated that the Confederate Flag logo should not be included on a license plate issued and owned by the state and bearing the name "VIRGINIA" on the top. The State's decision mirrors a previous case in which Virginia denied an applicant the right to include the phrase "UNION YES" on its license plate.

I respectfully submit that because Virginia owns the license plates it issues and rightfully controls what appears on them, it can, as part of its control, designate their content as its own speech. My position is consistent with the "well settled [principle] that the government need not permit all forms of speech on property that it owns and controls." *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).

As the panel opinion in this case concedes, "It is well established that `the government can speak for itself.'" *Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles*, 288 F.3d 610, 616 (4th Cir. 2002) (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). And this "authority to `speak' necessarily carries with it the authority to select from among

13

various viewpoints those that the government will express as its own." *Id.* at 617 (citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). But the panel reached the remarkable conclusion that the content on license plates owned and controlled by the State and bearing the State's name is not the State's speech. I respectfully disagree. The State has manifested its complete control over license plates, even dictating modifications, alterations, and special language or numbers that it will accept. And with the name "VIRGINIA" at the top of the license plates, any message conveyed by the plates' content is easily connected to the State. As such, I would conclude that the content of the license plates is government speech and that the State of Virginia did not run afoul of the First Amendment by rejecting a request from an applicant to authorize a license plate displaying a Confederate Flag logo.

The Supreme Court has recognized that the government may limit speech when the speech is that of the government or when the government uses private speakers to transmit its messages. This issue has been addressed most directly in cases where the Court allowed the government to restrict the speech of private individuals because those individuals were essentially speaking for the government as participants in federally funded programs. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) (upholding statutory criteria used to determine what artists were eligible for federal funds distributed by the National Endowment for the Arts and noting that "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake"); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (upholding regulations that prohibited Title IV projects from engaging in abortion counseling, referral, or activities advocation abortion as in method of family planning because "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way"); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (striking down restrictions placed on funding to Legal Services Corporation ("LSC") that prohibited recipients from engaging in representation involving challenges to the validity of existing welfare laws because "the lawyer [receiving LSC funds] is not the government's speaker," and thus "the LSC program

14

was designed to facilitate private speech, not to promote a governmental message"). The Supreme Court has recognized that these cases stand for the general principle that the government is free to control the content of its own speech. *See Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) (noting that the Court has "permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message").

By force of this principle, which authorizes the government to regulate even the speech of others who speak on behalf of the government, a State that owns and controls its license plates must be authorized to regulate the content of speech on them. Even though the applicant may request certain configurations of numbers and letters on license plates, the State retains the right to approve the license plates in accordance with its own preferences. At bottom, Virginia's licensing regulation does not abridge anyone's speech. Those who wish to display the Confederate Flag logo, even on their motor vehicles, remain free to do so. They are merely deprived of the right to demand that the Commonwealth of Virginia endorse their message by issuing license plates containing that logo.

The only license plate case to reach the Supreme Court seems to embrace the notion that license plates are the State's speech. *See Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that requiring a licensee to display the New Hampshire State slogan "Live Free or Die" was *compelled* speech in violation of the First Amendment). In *Wooley*, the Court acknowledged, albeit in concluding that license plate matters were compelled speech, that what appeared on license plates was the State's message, *id.* at 715, and that the licensee was being required to act as a "courier for such message," *id.* at 717.

I respectfully submit that it is impossible to avoid the conclusion that the Commonwealth of Virginia, by manufacturing license plates, placing its name at the top of those plates, and retaining ownership of them, is the speaker of any message contained on those plates, even though the message may have been adopted by the State pursuant to an application submitted by a licensee. The fact that the licensee also speaks by choosing to display a customized but authorized version of the license plate does not change the fact that the license plate itself

15

was the issue of the State and therefore constitutes government speech.

Because I believe we miss an important opportunity to air this issue before the entire court and to provide the Supreme Court with a reasoned discussion of the issue, I dissent from our refusal to rehear this case *en banc*.

GREGORY, Circuit Judge, dissenting from the denial of rehearing *en banc*:

I write, not to suggest that the ultimate result of the panel's decision would not be reached on full review, but to put forth my view that the panel did not fully and adequately analyze the "government speech" aspect of this case. What is, and what is not, "government speech" is a nebulous concept, to say the least. Indeed, as the panel recognized, "[n]o clear standard has yet been enunciated in our circuit or by the Supreme Court for determining when the government is `speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so." *Sons of Confederate Veterans, Inc. v. Comm'r of the Virginia DMV*, 288 F.3d 610, 618 (4th Cir. 2002).[1] The panel utilized a four-factor test, borrowed from our sister circuits, which may well be a good starting point in tackling this difficult issue. However, I have two fundamental problems with the panel's analysis.

First, even assuming the test is the correct and only standard by which we are to decide this issue, the panel's application of the test is incomplete at best. The opinion, in almost cursory fashion, finds each factor to weigh in favor of private speech. With these findings, I respectfully disagree.[2] I also believe there is more to be said about

---

[1] I must note that I do not necessarily agree with the panel's implication in this statement that the government can always engage in viewpoint discrimination when it is the speaker. It may be that "the values underlying viewpoint neutrality should in some circumstances limit the government's ability to skew the debate and suppress disfavored ideas or information." Marjorie Heins, *Viewpoint Discrimination*, 24 Hastings Const. L.Q. 99, 159 (1996).

[2] For example, I am utterly unconvinced that the private citizen bears the "ultimate responsibility" for the speech in this case. The panel gave

16

the test, including how the factors relate to each other, and the relative weight to be given each factor.

Second, though I recognize the utility of the four-factor test, I submit that the test may not be sufficiently nuanced to resolve the underlying issue here. Whether or not an expressive event has a component attributable to the government is not nearly as black and white as the test would suggest. This case is a difficult one, not simply because it involves the Confederate flag, but because license plate programs like the one implemented here really have elements of both private *and* government speech.[3]

The opinion, in my view, fails to recognize the blurry and sometimes overlapping line between private and government speech. I would have hoped, if rehearing were granted, that we would consider the government's interest in avoiding "speech by attribution;" that is, the government's right not to be compelled to speak by private citizens.[4] "Speech by attribution," a largely unexplored concept of First Amendment jurisprudence, demonstrates the tricky interplay and relationship between the concepts of private and government speech.

For even if the display of the Confederate flag is not considered "pure" government speech, that there will be a perception of government endorsement of the Confederate flag is undeniable. Though the panel disagrees, the display of the Confederate flag *will* be attributed to Virginia. In order to avoid any confusion about Virginia's official position regarding its display, the Confederate flag has essentially been "zoned off" state-issued license plates. In other words, the state has enacted a time, place, and manner restriction, that is designed to deal with a negative externality of what otherwise may be protected

---

*very* short shrift to this factor—the factor I think may very well be a key to the case. The panel opinion simply states, in what amounts to little more than *ipse dixit*, that the government does not bear the ultimate responsibility for the speech.

[3] This is particularly true with respect to the Confederate flag, which conveys a historically "governmental" message.

[4] The Commonwealth is in a position very similar to that of objecting drivers in *Wooley v. Maynard*, 430 U.S. 705 (1977).

17

symbolic speech. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 45-49 (1986); *see Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 82 n.4 (1976) (Powell, J., concurring) ("If [the city] had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location."). The most plausible explanation for the statute is that it was aimed at this problem of "speech by attribution." *Cf. Boy Scouts of America v. Dale*, 530 U.S. 640, 655-56 (2000) (recognizing private organization's interest in not communicating message of individual member that is incompatible with organization's message). I believe this was the predominate concern that motivated its enactment, not the content of SCV's message, or their particular viewpoint. *Renton*, 474 U.S. at 48. Laws of this sort are typically reviewed under the intermediate scrutiny standard. *See Los Angeles v. Alameda Books, Inc.*, ___ U.S. ___, 122 S. Ct. 1728, 1733-34 (2002) (plurality opinion); *Renton*, 475 U.S. at 50.

It is at least arguable, and I think quite likely, that this law would survive intermediate scrutiny. As already stated, the ban on the Confederate flag is designed to serve the substantial government interest of disassociating the Commonwealth from the Confederate flag. And reasonable alternative avenues of communication remain available. The *only* place the flag cannot be displayed is on the state-owned, state-issued license plate. Moreover, the SCV can still have a license plate, but without the flag. The SCV is therefore able to communicate the message that the license plate provision was originally meant to enable—that of membership in a particular organization. Thus, the statute is more than reasonable; it is as narrowly tailored as it could possibly be.

The issues presented here are important ones, unresolved by precedent, and, in my view, worthy of en banc review. Five members of this Court have voted for rehearing en banc. This Court should take pause and avail itself of its collective wisdom before striking down a statute of the Commonwealth of Virginia that, in my view, makes a rational attempt to balance government and private interests. This Nation has yet to heal from the deep wounds left by the Civil War. Ghosts from that terrible war and the issues of slavery still haunt America's public institutions. Somehow we, as Americans, must transcend this divide and find a way to "bind up the Nation's wounds."

18

Abraham Lincoln, Second Inaugural Address (March 4, 1865), *in The Living Lincoln* 640 (Paul M. Angle & Earl S. Miers eds., Barnes & Noble Books 1992). Perhaps the legislature, duly elected by the people of Virginia, got it right. Enacting a statute that allowed members of the SCV to display their heritage in a proud and positive manner, without the Commonwealth of Virginia being perceived as promoting a symbol that has and continues to be the source of so much pain, was truly a step toward healing our Nation. Perhaps it would give many Virginians an opportunity to see the issues in a different light and begin to appreciate the SCV's celebration of heritage, without seeing "stars" or peering through "bars."

19