**PUBLISHED**

Filed: June 28, 2004

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PLANNED PARENTHOOD OF SOUTH
CAROLINA INCORPORATED; RENEE
CARTER,

*Plaintiffs-Appellees,*

v.

B. BOYKIN ROSE, in his official
capacity as the Director of the
Department of Public Safety of the
State of South Carolina; JON E.
OZMINT, in his official capacity as
the Director of the Department of
Corrections of South Carolina; KIM
S. AYDLETTE, in her official capacity
as the Director of the Department of
Social Services of South Carolina,

*Defendants-Appellants.*

No. 03-1118

LIBERTY COUNSEL; LOUISIANA
LAWYERS FOR LIFE; LOUISIANA
FAMILY FORUM; LOUISIANA LAW &
JUSTICE FOUNDATION,

*Amici Supporting Appellant.*

## ORDER

Appellants filed a petition for rehearing and rehearing *en banc*.

Judge Luttig, Judge Michael, and Judge Gregory voted to deny the
petition for rehearing.

On the poll requested by a member of the court on the petition for rehearing *en banc*, Judge Widener, Judge Niemeyer, Judge Williams, Judge Traxler, and Judge Shedd voted to grant rehearing *en banc*. Chief Judge Wilkins, Judge Wilkinson, Judge Luttig, Judge Michael, Judge Motz, Judge King, Judge Gregory, and Judge Duncan voted to deny rehearing *en banc*.

The petition for rehearing is denied, and because the poll of judges in active service failed to produce a majority in favor of rehearing *en banc*, the petition for rehearing *en banc* is also denied. Judge Wilkinson wrote an opinion concurring in the denial of rehearing *en banc*. Judge Shedd wrote an opinion, joined by Judge Williams, dissenting from the denial of rehearing *en banc*.

Entered for the Court,

/s/ Patricia S. Connor
CLERK

WILKINSON, Circuit Judge, concurring in the denial of rehearing en banc:

At issue here is a South Carolina statute allowing citizens to opt for specialty license plates bearing the message "Choose Life." *See* S.C. Code Ann. § 56-3-8910. No specialty license plate with the opposite message is similarly available. Planned Parenthood of South Carolina, Inc. and Renee Carter have challenged the statute authorizing the "Choose Life" plates. The statute's message could be reversed and the plaintiffs' position could be pro-life, not pro-choice, but the principles that govern this case would remain the same.

I vote to deny rehearing en banc. I simply do not believe the state should use license plates to practice viewpoint discrimination. *See Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 305 F.3d 241, 242 (Wilkinson, C.J., concurring in the denial of rehearing en banc). That is plainly what is happening here. The state is saying that its citizens may express one view on a profound controversy but not the other. Citizens are permitted to express their agreement with the officially sanctioned policy, but they have no sim-

ilar outlet to express their disagreement with it. This is a presidential election year. May a state issue plates touting one candidate, but not another? It is one thing for states to use license plates to celebrate birds and butterflies, military service, historical events and scenic vistas. It is quite another for the state to privilege private speech on one side — and one side only — of a fundamental moral, religious, or political controversy.

The state would argue that its viewpoint discrimination is permissible, because its license plates constitute pure government speech. But the speech here only becomes speech by virtue of a citizen's choice. When speakers mount a soapbox or hoist a placard, one presumes they are free to create their own messages. I am not convinced that the mere presence of a license plate allows the state unlimited authority to channel would-be speakers into privileged categories of expression of the state's own choosing.

Just as I considered *Sons of Confederate Veterans* "a free speech case, not . . . a Confederate flag case," *id.* at 242, this to me is a First Amendment case, not a case about abortion. "It will not do to decide the same question one way between one set of litigants and the opposite way between another." Benjamin N. Cardozo, *The Nature of the Judicial Process* 33 (1921). The fact that Americans have deep differences of opinion on subjects such as these is all the more reason to recognize the unifying force of the First Amendment principle — namely, that none of us has the right to compel assent to our views, but that all of us have the right to express them. The state's failure to be neutral on the right to speak about our most divisive issues will give rise to great resentment. The confidence that all are treated equally with respect to belief, conscience, and expression enables Americans to transcend difference and to make "e pluribus unum" the lasting legacy of our nation.

SHEDD, Circuit Judge, dissenting from the denial of rehearing *en banc*:

According to the panel, the South Carolina General Assembly may enact a statute declaring "Choose Life" the official motto of the state, and that message may be printed on every standard license plate issued to vehicle owners in the state, but the General Assembly may

not take the *less* intrusive step of enacting a statute authorizing a specialty license plate bearing precisely the same message for interested vehicle owners willing to pay a higher fee. Not only is this result bizarre on its face, but it also reflects a misapplication of our recent decision in *Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002) ("*SCV*"). Because the panel's decision unduly restricts the ability of elected officials to express the views of their constituents on *any* issue, however controversial, I dissent from the denial of rehearing *en banc*.[1]

## I.

South Carolina issues a license plate to the owner of every vehicle registered in and licensed by the State. S.C. Code Ann. § 56-3-1210. The State owns every license plate, but state law requires that the plate be displayed on the vehicle. *Id.* There are two basic methods by which South Carolina permits issuance of specialty license plates. One method for obtaining a specialty plate is by application to the Department of Public Safety ("DPS") pursuant to the administrative approval process described in S.C. Code Ann. § 56-3-8000. Under this statute, a certified nonprofit organization (or a member of such organization) desiring a specialty plate must apply to DPS and submit four hundred prepaid applications or a $4,000 deposit, as well as a marketing plan for sale of the plate. *Id.* § 56-3-8000(A)-(B). DPS has discretion to "alter, modify, or refuse to produce" any organizational specialty plate that it deems "offensive" or that "fails to meet community standards." *Id.* § 56-3-8000(H). Once approved, a specialty plate under this section is available only to certified members of the relevant organization. *Id.* § 56-3-8000(D). Revenues generated by sales of such a plate may be spent only to defray the costs of producing nonprofit organizational plates pursuant to this section. *Id.* § 56-3-8000(F).

---

[1]It is important to note that the panel's analysis applies equally to *all* messages printed on specialty license plates, not just messages concerning abortion. Given the wide variety of messages currently appearing on specialty plates in South Carolina, *see* discussion *infra*, the implications of this decision are far-reaching indeed.

A second method for obtaining a specialty plate is by direct action in the General Assembly. The General Assembly has enacted separate statutes authorizing issuance of specialty plates to members of certain organizations. *See*, *e.g.*, S.C. Code Ann. § 56-3-3410 (National Wild Turkey Federation); *id.* § 56-3-3800 (American Legion); *id.* § 56-3-7100 (Shriners); *id.* § 56-3-8200 (Rotary International); *id.* § 56-3-8400 (Lions Club); *id.* § 56-3-8600 (Ducks Unlimited). Likewise, the General Assembly has authorized specialty plates recognizing organizations for issuance to any interested vehicle owner. *See*, *e.g.*, *id.* § 56-3-3600 (South Carolina Nurses); *id.* § 56-3-4100 (South Carolina Elks Association); *id.* § 56-3-90 (Sertoma International). In addition, the General Assembly has approved specialty plates for disabled veterans, *id.* § 56-3-1120; former prisoners of war, *id.* § 56-3-1150; Medal of Honor recipients, *id.* § 56-3-1850; Purple Heart recipients, *id.* § 56-3-3310; Normandy Invasion survivors, *id.* § 56-3-5350; Pearl Harbor survivors, *id.* § 56-3-5920; and World War II veterans and their spouses, *id.* § 56-3-8800, among others. The General Assembly has even approved a specialty plate commemorating the introduction of the "Shag" as South Carolina's state dance. *Id.* § 56-3-3910.

The General Assembly does not authorize specialty plates merely to recognize certain individuals, organizations, and the official dance. Some authorizing statutes earmark revenues generated from sales of specialty plates to support identified programs. *See*, *e.g.*, *id.* § 56-3-5010 (earmarking a portion of the fees generated by the "Public Education: A Great Investment" plate for the purchase of computers in identified school districts); *id.* § 56-3-7300 (requiring fees collected for sales of a Saltwater Fishing plate to be deposited into a special account for management and conservation of the state's marine resources); *id.* § 56-3-7910 (requiring fees collected for sales of the *H.L. Hunley* submarine plate to be distributed to the Fund to Save the *Hunley* for continued curation efforts); *id.* § 56-3-9100 (earmarking proceeds from sales of the South Carolina Technology Alliance plate for development of high technology programs and businesses); *id.* § 56-3-930 (earmarking proceeds from sales of "United We Stand" plates for deposit into a fund created to establish rewards for the capture of terrorists); *id.* § 56-3-9500 (designating proceeds from sales of "God Bless America" plates for use by the South Carolina National Guard for homeland security purposes); *id.* § 56-3-9600 (designating

proceeds from sales of "No More Homeless Pets" plates for animal spaying and neutering programs).

On rare occasions, the General Assembly takes the unusual step of prescribing the message that appears on a specialty plate. For instance, the Nongame Wildlife and Natural Areas Fund plate must bear the message "South Carolina Protects Endangered Species," *id.* § 56-3-4510, and another plate must bear the message "Public Education: A Great Investment," *id.* § 56-3-5010. The General Assembly has authorized specialty plates bearing the messages "Conserve South Carolina," *id.* § 56-3-2540; "Keep South Carolina Beautiful," *id.* § 56-3-3950; "In God We Trust," *id.* § 56-3-9200; "United We Stand," *id.* § 56-3-9300; and "God Bless America," *id.* § 9500, among others.[2]

In 2001, the General Assembly enacted a separate statute authorizing the issuance of a specialty plate bearing the message "Choose Life." *Id.* § 56-3-8910. This plate is available to all interested vehicle owners in the State. *Id.* § 56-3-8910(A). Purchasers of the "Choose Life" plate must pay a $70 fee every other year in addition to the basic fee for license plates, and proceeds from sales of this plate are earmarked for a special account from which the South Carolina Department of Social Services makes grants to support crisis pregnancy programs. *Id.* § 56-3-8910(A)-(B). The statute specifically provides that such grants "may not be awarded to any agency, institution, or organization that provides, promotes, or refers for abortion." *Id.* § 56-3-8910(B). Under the "Choose Life" statute, production of the specialty plate could commence once the South Carolina Department of Motor Vehicles received four hundred prepaid applications or a $4,000 deposit; in this respect, the "Choose Life" statute is identical to other specialty license plate statutes that support special programs and prescribe particular messages. *See*, *e.g.*, *id.* § 56-3-4410; *id.* § 56-

---

[2]The panel erroneously asserts that South Carolina does not authorize specialty plates bearing messages concerning "politically controversial" subjects. *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 788 (4th Cir. 2004). Not only does this assertion ignore the fact that environmental policy, education policy, and government-sponsored references to God often generate public controversy, but it erroneously suggests that the degree of controversy surrounding a particular message affects the status of that message vis-a-vis the First Amendment.

3-5200; *id.* § 56-3-7300; *id.* § 56-3-7910; *id.* § 56-3-9100; *id.* § 56-3-9200; *id.* § 56-3-9300; *id.* § 56-3-9500; *id.* § 56-3-9600.

## II.

The outcome of this case depends upon the proper characterization of the statutorily prescribed "Choose Life" message as private speech or government speech.[3] If the "Choose Life" message is properly labeled private speech, then the government has preferred one private message over other messages based upon the viewpoints of those messages. The First Amendment ordinarily does not permit such viewpoint discrimination. *SCV*, 288 F.3d at 622 (citing *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998), and *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 1995)). If, on the other hand, the "Choose Life" message is properly labeled government speech, then the ordinary prohibition against viewpoint discrimination is inapplicable and the statute survives First Amendment scrutiny. The government can speak for itself, and it can take measures designed to ensure that its message is not distorted. *SCV*, 288 F.3d at 616-17 (citing *Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000), and *Griffin v. Department of Veterans Affairs*, 274 F.3d 818, 822 (4th Cir. 2001)). As we noted in *SCV*, "[t]he rationale behind the government's authority to draw otherwise impermissible viewpoint distinctions in the government speech context is the accountability inherent in the political process." 288 F.3d at 618 (citing *Southworth*, 529 U.S. at 235).[4]

---

[3]The State sought reconsideration of the standing issue as well as the substantive First Amendment issue. At the very least, the panel's standing analysis should have reckoned with contrary decisions from the Fifth and Eleventh Circuits in the only other federal appellate cases involving "Choose Life" license plates. *See Henderson v. Stalder*, 287 F.3d 374 (5th Cir.), *cert. denied*, 123 S. Ct. 602 (2002); *Women's Emergency Network v. Bush*, 323 F.3d 937 (11th Cir. 2003). Indeed, the Eleventh Circuit found standing lacking even where the plaintiffs had attempted, but failed, to obtain enactment of a statute authorizing pro-choice specialty plates. *Women's Emergency Network*, 323 F.3d at 946 n.12. No such effort was made in this case.

[4]Drawing distinctions between private speech and government speech can be a difficult task in the context of license plates. Since the govern-

In determining whether a particular message constitutes private speech or government speech, we consider four separate, but closely related, factors: (1) the purpose of the program in which the speech occurs, (2) the degree of editorial control over the speech by the government, (3) the identity of the literal speaker, and (4) which party — the government or a private party — bears ultimate responsibility for the speech. *SCV*, 288 F.3d at 618-19.

The speech at issue in *SCV* was the background logo of the Sons of Confederate Veterans, which included a representation of the Confederate flag. Although the Virginia legislature approved a specialty plate for the group, the authorizing statute included a unique restriction that prohibited the use of any symbol or emblem on the plate. We invalidated this logo restriction on the ground that it impermissibly discriminated against private speech based upon the viewpoint expressed by inclusion of the Confederate flag in the Sons of Confederate Veterans' logo. *Id.* at 626, 629.

In reaching this conclusion, we noted that the purpose of the program in which the speech occurred was to "produce revenue while allowing, on special plates authorized for private organizations, for the private expression of various views." *Id.* at 619. Moreover, the

---

ment produces the plate, issues the plate for identification purposes, and actually owns the plate, it may always be said that the government speaks whatever message appears on a particular plate; at the same time, since a private individual or entity owns the vehicle on which the plate is displayed, there is a very real sense in which that private party may be said to speak the message that appears on the plate. *See Planned Parenthood*, 361 F.3d at 794; *Sons of Confederate Veterans v. Commissioner of Va. Dep't of Motor Vehicles,* 305 F.3d 241, 245-46 (4th Cir. 2002) ("*SCV II*") (Luttig, J., respecting denial of reh'g *en banc*); *id.* at 252 (Gregory, J., dissenting from denial of reh'g *en banc*). Nevertheless, while the "private speech" and "government speech" categories are imprecise when applied to messages printed on license plates, they remain useful in describing the degree of government involvement in creating and speaking particular messages. The bottom-line question, then, is whether the government speech component to the "Choose Life" message is so substantially greater than the private speech component that the message may fairly be characterized as "government speech."

state exercised "little, if any" editorial control over the content of specialty license plates. *Id.* at 621. Citing *Wooley v. Maynard*, 430 U.S. 705 (1977), for the proposition that "license plates . . . implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle," we concluded that the literal speaker was the vehicle owner rather than the government and that the vehicle owner bore ultimate responsibility for the message conveyed by the Sons of Confederate Veterans logo. *SCV*, 288 F.3d at 621. As a result, we held that the background logo on the Sons of Confederate Veterans specialty plate was private speech rather than government speech. *Id.*

The statutory scheme at issue here differs in material respects from the scheme at issue in *SCV*, and I believe that the four-factor analysis yields a different result. With respect to the first factor, there can be no doubt that the primary purpose of the "Choose Life" statute is to express the General Assembly's current position on the abortion issue. A secondary purpose of the statute is to generate revenues for crisis pregnancy programs, specifically programs that do not provide or promote abortions. As the panel correctly recognized, this statute was intended to make a statement about the General Assembly's preference for the pro-life position. *Planned Parenthood*, 361 F.3d at 793.

It is equally clear that the General Assembly exercised *complete* editorial control over the "Choose Life" plate. The General Assembly created and codified the particular message that appears on the plate. Unlike the statute at issue in *SCV* — and unlike most other specialty-plate statutes in South Carolina — the "Choose Life" statute actually mandates the message that appears on the plate.

To this point in the analysis, the "Choose Life" message is plainly government speech. The government intended to express its own viewpoint, and it created a message to achieve that objective. The panel concedes this much. *Planned Parenthood*, 361 F.3d at 793. At this point, however, the panel takes a turn toward private speech that I find unwarranted. While I do not disagree that the vehicle owner is *a* literal speaker with respect to the "Choose Life" message, the panel's analysis too quickly dismisses the government's role as the predominant speaker.

The panel begins with the modest proposition that messages on license plates "are associated at least partly with the vehicle owners." *Planned Parenthood*, 361 F.3d at 794 (citing *Wooley*, 430 U.S. at 717). Indeed, *Wooley* goes no further than that. At issue in *Wooley* was a New Hampshire statute making it a misdemeanor knowingly to obscure the figures or letters on a license plate, including the state's motto, "Live Free or Die." The Supreme Court held that New Hampshire could not punish vehicle owners who registered their objections to the state motto by obscuring that message on their license plates. *Id.* at 717. More broadly, a state cannot "require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Id.* at 713. Because there is nothing in this case remotely akin to compelled speech, *Wooley* is of little use here. For present purposes, *Wooley* suggests that (1) the government can speak its messages through the medium of license plates but (2) vehicle owners may choose to reject the government's messages. Thus, *Wooley* recognizes that both the government and the vehicle owner are literal speakers, to varying degrees, with respect to messages printed on license plates. To decide this case (and any specialty license plate case), we must ask whether any peculiar circumstance surrounding the specialty plate so diminishes the government's role as a literal speaker or highlights the vehicle owner's role as a literal speaker that one or the other party must be deemed the sole speaker.

The panel concludes that the vehicle owner should be treated as the literal speaker of the message on a specialty license plate because "the specialty plate gives private individuals the option to identify with, purchase, and display one of the [State's] authorized messages." *Planned Parenthood*, 361 F.3d at 794. I disagree. By giving interested citizens the option to endorse its message, the State has not lost its place as the literal speaker of that message. The proper question is whether the private citizen "engages the government to publish *his* message" or the government "engages the private citizen to publish *its* message." *SCV II*, 305 F.3d at 246 (Luttig, J.). The Virginia statute at issue in *SCV* called for a specialty plate to be issued only upon application by an organization, with the design of that plate proposed by the organization. Thus, the message was created by private citizens, and it was left to the government to approve or disapprove that

message. By contrast, under South Carolina's "Choose Life" statute, the government expresses its message on its own initiative, and private citizens are invited to take that message or leave it. Private citizens do not suggest the message, nor do they compose it. On their own, they cannot change the message. The vehicle owner's purchasing the specialty plate signifies his endorsement of the State's message, not his engaging the State to speak his own message.

Just as the State should be deemed the literal speaker of the "Choose Life" message, so the State will bear ultimate responsibility for that message. The General Assembly alone created the message, and it wrote that message into state law for the watching electorate to see. Assuming that the panel correctly perceives the divisiveness of the abortion issue in South Carolina, that fact would suggest a *heightened* awareness by voters of the General Assembly's role in authorizing the "Choose Life" plate. I can think of no more transparent act of government than the enactment of a statute that says in plain terms what it purports to do. I can think of no clearer demonstration of political accountability than for citizens opposed to this "Choose Life" license plate to turn out the current government and replace it with a government that will amend or repeal the statute and perhaps even replace it with a statute calling for pro-choice specialty plates. *See Southworth*, 529 U.S. at 235 ("When the government speaks . . . it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position."). According to the factors set out in *SCV*, South Carolina's "Choose Life" license plate is properly characterized as government speech, not private speech, and is therefore permissible under the First Amendment.

## III.

The "Choose Life" statute does not create a forum for private expression so much as it supports an established government program. The Supreme Court in *Rust v. Sullivan*, 500 U.S. 173 (1991), approved the federal government's policy of offering federal funds to private health clinics on the condition that those clinics not counsel or provide abortions. *Id.* at 193. Answering the argument that the federal government was restricting private physicians' speech based

upon viewpoint, the Court stated that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* In other words, when the government establishes a program, it is permitted to define the contours of that program as it sees fit. *Rust*, 500 U.S. at 194. The government may refuse to fund speech that is inconsistent with the program thus defined. *Id.* at 194-95.

The "Choose Life" statute is analogous to the federal regulations at issue in *Rust*. The "Choose Life" statute earmarks revenues generated from sales of this specialty plate for a government grant program established to fund crisis pregnancy services that specifically do not counsel abortion. In furtherance of this identified program, the statute offers the plates for sale to private persons who wish to support the "Choose Life" message and the crisis pregnancy grant program. Just as in *Rust*, the government has created a program and enlisted willing participants to support that program. As in *Rust*, "we have not here the case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded." *Id.* If the government can actually *restrict* private entities' speech in furtherance of an established government program, as it did in *Rust*, then surely it can speak its own message — without restricting anyone else's speech — in furtherance of such a program. *See* 500 U.S. at 193 (stating that "[t]here is a difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy").

Perhaps even more troubling are the panel's contentions that "the State's role in promoting the Choose Life message is obscured from the public" and that the "Choose Life" statute represents "cloaked advocacy" that insulates the General Assembly from criticism and electoral retribution. *Planned Parenthood*, 361 F.3d at 795-96, 798. Nothing but the panel's conjecture supports such conclusions.

According to the panel, ordinary South Carolinians will likely be *misled* into believing that the presence of the "Choose Life" plate and the absence of an opposing plate "are the result of popular choice." *Id.* at 798. Likewise, the panel worries that ordinary citizens might be *misled* into thinking that the State "has already won support for the position it is promoting." *Id.* The panel offers no justification for its suspicion that the government of South Carolina — the General Assembly and the governor — misrepresented popular sentiments when it enacted the "Choose Life" statute. In any event, whether or not a majority of South Carolina voters approve the "Choose Life" message, a majority of their elected representatives did approve that message in open session and on a public record. If those duly elected representatives misjudged their constituents' opinions, then they will be held accountable for their error; if the abortion issue is as controversial in South Carolina as the panel asserts, then a legislator's vote on the "Choose Life" statute will surely be noticed. We ought not short-circuit regular political processes based upon speculation that the citizens of South Carolina cannot discern what role their elected representatives played in enacting the "Choose Life" statute.

The mere fact that the General Assembly has authorized a myriad of specialty license plates does not diminish its accountability for the "Choose Life" message. First, it is the rare specialty plate for which the General Assembly actually writes the message — an act more conspicuous when it happens than the simple approval of an organization's suggested design. Second, if the panel is correct that abortion is an especially divisive issue in South Carolina, then the General Assembly's taking the extraordinary step of authoring the "Choose Life" message would be expected to draw extraordinary public attention. Under the panel's view, merely allowing issuance of plates other than the standard plate so confuses ordinary citizens that they cannot be expected to know when their legislature takes sides in an important debate.[5]

---

[5]The panel's suggestion that the General Assembly scrap the "Choose Life" statute and replace it with a new statute making "Choose Life" an official motto of the State is dubious at best. Under the panel's own reasoning, the problem here is the *medium*: Specialty license plates do not readily identify the literal speaker of the message, such that ordinary citizens cannot hold their elected leaders accountable for their role in speak-

IV.

"It is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens." *Southworth*, 529 U.S. at 229. Indeed, the General Assembly has adopted and pursued a policy concerning abortion that is contrary to some South Carolinians' sincere convictions. The question here is not whether the General Assembly has expressed the *correct* position, or even the more *popular* position; rather, the question is whether the General Assembly may express *any* position on a specialty license plate. The panel says it may not, even though there is no danger that vehicle owners who object to the "Choose Life" message will be compelled to display this plate and even though the General Assembly (unlike the Virginia legislature in *SCV*) has not in any way singled out a group or message for unfavorable treatment. This holding unduly restricts the ability of state governments to express the views of their constituents on matters of public importance.

It is important to note that the panel's holding affects much more than the "Choose Life" plate alone. The General Assembly has taken similar action with respect to environmental conservation, S.C. Code Ann. § 56-3-3950; public education, *id.* § 56-3-5010; and even the war on terror, *id.* § 56-3-9300. The messages expressed on these topics may be described as ideological and even controversial. Like the "Choose Life" plate, the specialty plates approved in these statutes are the creatures of ordinary political processes; their messages are prescribed by the legislature itself; and they are made available to any interested vehicle owner willing to pay an extra fee. Like the "Choose Life" plate, these plates generate revenues earmarked for specific government programs. Under the panel's analysis, these plates and others like them must be discontinued unless the General Assembly also provides for plates bearing contrary messages. In other words,

---

ing that message. *Planned Parenthood*, 361 F.3d at 798-99. If the problem is the *medium*, then it should make no difference at all whether "Choose Life" is designated an official motto. By the panel's logic, *no message appearing on a specialty license plate can be treated as government speech* because the *medium* obscures the State's role as a speaker.

the State cannot speak through specialty license plates *unless* it dilutes or distorts its own message. *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (noting that when the government speaks, it can take steps to ensure that its message is not "garbled or distorted").

We have come a long way from *Wooley*'s instruction that a State may not conscript private vehicles to serve as "mobile billboards" for its messages. The objectors in *Wooley* expressed their rejection of the State's message by covering that message with tape. Now it seems that the State, before it speaks, must anticipate the objection of a citizen and place the tape over its own message. In the end, the panel's decision muzzles everyday political action based on the mistaken belief that reasonable citizens cannot tell that their government is speaking when it enacts a specific statute calling for production of a specialty license plate bearing a particular message. If a government cannot be deemed to speak through such a statute, then I wonder how it can speak at all.

Judge WILLIAMS joins in this opinion.