# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 08-1429

_____

Kevin M. Roach; Choose Life of          *
Missouri, Inc.,                         *
                                        *
          Appellees,                    *
                                        *
     v.                                 *
                                        *
Bill Stouffer,                          *          Appeal from the United States
                                        *          District Court for the
          Defendant,                    *          Western District of Missouri.
                                        *
Karen King Mitchell,[1]                 *
                                        *
          Appellant,                    *
                                        *
Matt Bartle; John Griesheimer; Delbert  *
Scott; Frank Barnitz; Joan Bray; Rita   *
Heard Days; Neal St. Onge; Charlie      *
Schlottach; Lanie Black; Mike Daus;     *
Wayne Henke, in their official capacity as  *
members of the Joint Committee on       *
Transportation Oversight; Terry Young, in  *
her official capacity as Director of the  *
Missouri Department of Revenue; Charlie  *

_____

[1]Choose Life initially filed suit against Trish Vincent, the former Director of the Missouri Department of Revenue, but we substitute Karen King Mitchell, the current Director of the Missouri Department of Revenue. _See_ Fed. R. App. P. 43(c)(2).

Denison, in his official capacity as a     *
member of the Joint Committee on     *
Transportation Oversight,     *
    *
          Defendants.     *
_____     *
    *
Eagle Forum Education and Legal Defense     *
Fund; Law Students Pro-Life at     *
Washington University in St. Louis School     *
of Law; Students for Life; Life Choice     *
Center for Women; LifeChoices Medical     *
Clinic and Resource Center; Lifeline     *
Pregnancy Resource Center; Open Arms     *
Pregnancy Resource Center; Options     *
Pregnancy Clinic; Pregnancy Care Center;     *
Thrive St. Louis; Pregnancy Care Centers;     *
Pregnancy Support Center; The National     *
Legal Foundation,     *
    *
          Not Party - Amici on     *
          Behalf of Appellee.     *

_____

Submitted: October 16, 2008
Filed: March 26, 2009 (Corrected: 3/26/2009)

_____

Before GRUENDER, BEAM and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Choose Life of Missouri, Inc. is a nonprofit Missouri corporation. Kevin Roach is the founder, president, and chairman of the board of directors of Choose Life of Missouri, Inc. Choose Life and Roach (collectively, "Choose Life") filed suit against

Karen King Mitchell, Director of the Missouri Department of Revenue ("DOR"), in her official capacity, and against the members of the Joint Committee on Transportation Oversight ("Joint Committee") in their official capacities (collectively, "appellants") after the Joint Committee denied Choose Life's application to obtain a specialty license plate. The district court[2] granted summary judgment to Choose Life, declared section 21.795(6) of the Missouri Revised Statutes to be unconstitutional, and entered an injunction requiring Mitchell to issue Choose Life's specialty license plate. The appellants appeal, and for the reasons discussed below, we affirm.

## I. BACKGROUND

The State of Missouri permits drivers to obtain "specialty" license plates for a fee in addition to the ordinary registration fee. Like regular license plates, specialty plates contain a combination of identifying letters and numbers. However, specialty plates contain a specific message or symbol from a sponsoring organization that replaces the state moniker "Show Me State."

Missouri law provides for two methods to create a specialty plate. First, the Missouri Legislature can pass a bill that creates a specialty plate. Approximately seventy specialty plates have been created by the Missouri Legislature for organizations such as the March of Dimes, the Missouri Civil War Reenactors Association, and the Missouri Society of Professional Engineers. *See, e.g.*, Mo. Rev. Stat. § 301.3032-.3148. Second, private organizations can apply to the DOR for a specialty plate. Mo. Rev. Stat. § 301.3150. Section 301.3150 sets out the requirements and administrative procedures for an application to the DOR.

---

[2]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

1.  An organization . . . that seeks authorization to establish a new specialty license plate shall initially petition the department of revenue by submitting the following:

> (1) An application in a form prescribed by the director for the particular specialty license plate being sought, describing the proposed specialty plate in general terms and have a sponsor of at least one current member of the general assembly.  The application may contain written testimony for support of this specialty plate;
>
> (2) Each application submitted pursuant to this section shall be accompanied by a list of at least two hundred potential applicants who plan to purchase the specialty plate if the specialty plate is approved pursuant to this section; [and]
>
> (3) An application fee, not to exceed five thousand dollars, to defray the department's cost for issuing, developing and programming the implementation of the specialty plate, if authorized;
> . . . .

7.  The department of revenue shall submit for approval all applications for the development of specialty plates to the joint committee on transportation oversight during a regular session of the general assembly for approval.

8.  If the specialty license plate requested by an organization is approved by the joint committee on transportation oversight, the organization shall submit the proposed art design for the specialty license plate to the department as soon as practicable, but no later than sixty days after the approval of the specialty license plate.

*Id.*   Meanwhile, section 21.795(6) governs the Joint Committee's process for approving or denying the specialty plate applications.

> The [Joint Committee] shall also review for approval or denial all applications for the development of specialty license plates submitted to it by the department of revenue. The committee shall approve such application by a unanimous vote. The committee shall not approve any application if the committee receives a signed petition from five house members or two senators that they are opposed to the approval of the proposed license plate. The committee shall notify the director of the department of revenue upon approval or denial of an application for the development of a specialty plate.

Mo. Rev. Stat. § 21.795(6). If an application is denied, the organization can make a request to the Joint Committee for a "review" of the Joint Committee's determination within fifteen days of receiving the notice of denial. Mo. Rev. Stat. § 301.3152. Specialty plates for groups such as the Missouri Hospice Organization, Ethan and Friends for Autism, and Missouri's Cattlemen Foundation have been approved and produced using this process. A vehicle owner who wishes to obtain a specialty plate must pay the State of Missouri a fifteen dollar fee in addition to the normal license plate registration fee and comply with the requirements of the sponsoring organization, which often include a required donation to the organization.

Using the second method, Choose Life submitted an application to the DOR for a "Choose Life" specialty license plate and fully complied with the requirements listed in section 301.3150. Missouri State Senators Joan Bray and Rita Heard Days, both of whom describe themselves as "pro-choice" and both of whom are members of the Joint Committee, submitted a letter to the Chair of the Joint Committee opposing the "Choose Life" specialty plates. Accordingly, the Joint Committee denied the application. Choose Life requested a review of the Joint Committee's decision under section 301.3152. The Joint Committee again rejected the application.

Choose Life filed suit, arguing that the Joint Committee's denial of the "Choose Life" specialty plate violated its rights to free speech, due process and equal protection under the United States Constitution and its right to free speech under the Missouri

-5-

Constitution. Choose Life sought a permanent injunction requiring Mitchell to issue the "Choose Life" specialty plate. Choose Life also sought a declaratory judgment that the specialty license plate statutory scheme was unconstitutional because it gave Missouri officials unbridled discretion to restrict private speech and that the Joint Committee acted unconstitutionally by denying the "Choose Life" specialty plates. Both parties moved for summary judgment. The district court denied the appellants' motion and granted Choose Life's motion. The district court held that the specialty plates constituted private speech and that the statutory scheme lacked adequate guidelines to prevent viewpoint discrimination by the state because "there is unbridled discretion given to the government official(s) in deciding to approve or deny a specialty license plate." The court thus struck down section 21.795(6) as unconstitutionally overbroad and entered an injunction requiring Mitchell to issue the "Choose Life" specialty plates.

The appellants appeal, arguing that the district court erred by denying the appellants' motion for summary judgment, by granting Choose Life's motion for summary judgment, and by entering the permanent injunction.

## II. DISCUSSION

We review a grant of summary judgment de novo. *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156 (8th Cir. 2008). We review the entry of a permanent injunction for an abuse of discretion. *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 533 (8th Cir. 2007). "A district court abuses its discretion when it bases its decision on a legal error or a clearly erroneous finding of fact." *Id.* at 534.

To determine whether Missouri's specialty license plate scheme survives a First Amendment challenge, we must first decide whether the messages contained on specialty plates communicate government or private speech. The appellants argue that the messages on specialty plates are government speech that need not be viewpoint

neutral. As the Supreme Court recently noted, "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. A government entity has the right to 'speak for itself.' '[I]t is entitled to say what it wishes,' and to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. ---, 129 S. Ct. 1125, 1131 (2009) (alteration in original) (internal citations omitted). Choose Life argues that the messages on specialty plates are private speech, the regulation of which must be viewpoint neutral. "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector*, 515 U.S. 819, 828 (1995).

The question whether the messages on specialty plates communicate government or private speech appears to be an issue of first impression in this circuit. We have, however, faced this issue with respect to personalized vanity plates, which are license plates that allow vehicle owners to arrange their license plates' identifying numbers and letters to create a personalized message. In *Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2001), a Missouri vehicle owner sought to purchase a vanity license plate with the phrase "ARYAN-1." At the time, Missouri law stated that "no personalized license plates shall be issued . . . which are obscene, profane, inflammatory or contrary to public policy." *Id*. at 1078 (emphasis omitted) (quoting Mo. Rev. Stat. § 301.144.2). We noted that even though "the state of Missouri technically owns the physical metal plate on which [the] message is displayed, . . . it occurs to us that a personalized plate is not so very different from a bumper sticker that expresses a social or political message." *Id*. at 1079. Ultimately, we struck down the part of the statute that allowed license plates to be rejected as contrary to public policy because it was vague and overbroad, thereby creating an impermissible risk that the government's suppression of unpopular ideas would violate the First Amendment. *Id*. at 1081. Although we did not explicitly decide whether the message on a vanity plate communicates government or private speech, we certainly implied that the vanity plate communicated private speech by equating it to a bumper sticker. *Id*. at 1079.

Since *Lewis*, the Supreme Court has addressed the distinction between government and private speech in the context of a federal program that financed generic advertising to promote beef. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005). The Supreme Court determined that when "the government sets the overall message to be communicated and approves every word that is disseminated," the speech is government speech. *Id*. at 562. In *Johanns*, two associations challenged a federal law requiring beef producers to subsidize promotional print and television messages to support the beef industry. *Id*. at 554-55. Finding that the advertising constituted government speech, the Court noted that "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal Government," that "Congress and the Secretary [of Agriculture] . . . set out the overarching message and some of its elements, and . . . left the development of the remaining details to an entity whose members are answerable to the Secretary," and that "the Secretary exercise[d] final approval authority over every word used in every promotional campaign." *Id*. at 560-61. Thus, under *Johanns*, the more control the government has over the content of the speech, the more likely it is to be government speech. *Accord Summum*, 129 S. Ct. at 1134 (finding that monuments in a city park constituted government speech in part because the government "'effectively controlled' the messages sent by the monuments . . . by exercising 'final approval authority' over their selection").

Meanwhile, both before and after *Johanns* our sister circuits have addressed the issue of whether specialty license plates, particularly "Choose Life" specialty plates, communicate government or private speech. In *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004), the Fourth Circuit reviewed a challenge to a South Carolina statute authorizing specialty plates with the "Choose Life" message. In deciding whether the "Choose Life" specialty plate communicated government or private speech, the Fourth Circuit employed a four-factor test that it had developed in *Sons of Confederate Veterans, Inc. v. Commissioner of Virginia Department of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002). In *Sons of Confederate*

*Veterans*, the Fourth Circuit announced that a court should consider the following four factors ("*SCV* factors") to determine whether the messages on specialty plates constituted government or private speech:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech.

*Id.* at 618.

Applying the *SCV* factors to South Carolina's "Choose Life" specialty plate statute, the Fourth Circuit in *Rose* determined that the specialty plates were "a mixture of private and government speech." *Rose*, 288 F.3d at 793. The court noted that the process of issuing the "Choose Life" specialty plate was initiated by South Carolina lawmakers and not private individuals, weighing in favor of government speech, but that the literal speakers were the vehicle owners who bore the ultimate responsibility for the speech, weighing in favor of private speech. *Id.* at 793-94. After finding that South Carolina had opened a limited forum by creating the "Choose Life" specialty plate and had engaged in viewpoint discrimination by denying access to that forum to those who disagreed with the pro-life position, the Fourth Circuit concluded that South Carolina violated the First Amendment by authorizing only the "Choose Life" specialty plate. *Id.* at 798-99.

Two years after *Rose*, the Sixth Circuit considered the constitutionality of Tennessee's "Choose Life" specialty plate statute. *Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370 (6th Cir. 2006). The Tennessee statute authorized specialty plates to raise revenue for certain "departments, agencies, charities, programs and other activities impacting Tennessee." Tenn. Code Ann. § 55-4-201(j). In 2003 the Tennessee legislature passed a statute authorizing the issuance of "Choose Life"

specialty plates, with half of the profits going to New Life Resources, Inc. *Bredesen*, 441 F.3d at 372. The American Civil Liberties Union challenged the constitutionality of Tennessee's "Choose Life" specialty plate statute.

Applying the Supreme Court's reasoning in *Johanns* to determine whether the message of the "Choose Life" specialty plates communicated government speech, the court stated, "*Johanns* stands for the proposition that when the government determines an overarching message and retains power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes." *Id*. at 375. The court noted that the Tennessee legislature chose the message and approved every word and that while "Tennessee . . . [left] some of the remaining details to an entity whose members [were] answerable to the State government," Tennessee "retain[ed] a veto over its design." *Id*. at 376 (internal quotation omitted). The court concluded that because Tennessee had "the right to wield 'final approval authority over every word used'" and set "the overall message to be communicated," the Choose Life message was "Tennessee's own message" and did not implicate private-speech rights. *Id*. (quoting *Johanns*, 544 U.S. at 561). The court ultimately concluded, however, that Tennessee had not opened a forum for speech when it sought to have private entities disseminate its message. *Id*. at 377. Because purchasing the specialty plates was voluntary and not compulsory as in *Johanns*, the Sixth Circuit determined that the statute did not violate the First Amendment. *Id*. at 379.

Two years after *Bredesen*, the Ninth Circuit faced a similar challenge to Arizona's "Choose Life" specialty plate. *Az. Life Coalition, Inc. v. Stanton*, 515 F.3d 956, 960 (9th Cir. 2008). Under Arizona's specialty plate law, an organization could submit an application for specialty plates to the Arizona Department of Transportation, which would then certify that the organization was a nonprofit organization and submit the request to the Arizona License Plate Commission. Ariz. Rev. Stat. Ann. § 28-2404; *Stanton*, 515 F.3d at 961. The statute then required the

Arizona License Plate Commission to issue the specialty plates. Ariz. Rev. Stat. Ann. § 28-2404(B). The Arizona Life Coalition applied for "Choose Life" specialty plates and met the statutory requirements. After the Arizona License Plate Commission declined to issue the specialty plates, the Arizona Life Coalition filed suit, challenging the refusal to issue the "Choose Life" specialty plates.

In deciding whether Arizona's specialty plates communicated government or private speech, the Ninth Circuit identified the *SCV* factors and determined that *Johanns* was factually distinguishable because specialty plates do not involve compelled speech or compelled subsidies. *Stanton*, 515 F.3d at 964. Nevertheless the court held that "*Johanns* is instructive when determining whether the message constitutes government or private speech." *Id*. at 965. The court "adopt[ed] the Fourth Circuit's four-factor test—supported by the Supreme Court's decision in *Johanns*—to determine whether messages conveyed through Arizona's special organization plate program constitute[d] government or private speech." *Id*.

In its analysis, the Ninth Circuit stated that the Arizona License Plate Commission's "de minimis editorial control over the plate design and color does not support a finding that the *messages* conveyed by the organization constitute government speech." *Id*. at 966. "[T]he statutory requirements address[ed] who may speak, not what they may say." *Id*. Finally, the court noted that the Arizona Life Coalition controlled the message of its special organization plate and that "the individual members who choose to purchase the plate voluntarily choose to disperse that message." *Id*. at 967. Thus, using the four-factor *SCV* test informed by *Johanns*, the Ninth Circuit held that the message on the "Choose Life" specialty plates was private speech. *Id*. The court concluded that the Arizona License Plate Commission violated the First Amendment by engaging in viewpoint discrimination when it denied the Arizona Life Coalition's application. The court then remanded the case with directions to require the Arizona License Plate Commission to approve the Arizona Life Coalition's application. *Id*. at 973.

-11-

Most recently, the Seventh Circuit addressed the specialty license plate issue in *Choose Life of Illinois, Inc. v. White*, 547 F.3d 853 (7th Cir. 2008). An Illinois statute required specific legislative approval before the Illinois Secretary of State could issue a particular specialty plate. *Id*. at 856. After reviewing the case law, the court announced that it found the approach of the Fourth and Ninth Circuits persuasive and explained that the *SCV* factors "can be distilled (and simplified) by focusing on the following inquiry: Under all the circumstances, would a reasonable person consider the speaker to be the government or a private party?" *Id*. at 863; *see also Summum*, 129 S. Ct. at 1142 (Souter, J., concurring in judgment) ("[T]he best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige . . . ."). The Seventh Circuit considered the shared editorial control between the state and the organization over the specialty plate's message, the significant fund-raising purpose of the specialty plate program, and its determination that the message on the plates is more likely to be associated with the plate's sponsoring organization and the vehicle's driver than with the state. *White*, 547 F.3d at 863-64. As a result, the court found that the message of the specialty plate did not communicate government speech and, therefore, implicated private-speech rights. *Id.* The court, however, refused to direct the Secretary of State to issue the "Choose Life" specialty plate because the state had excluded the entire issue of abortion from specialty plates, thereby engaging in acceptable content-based discrimination, rather than viewpoint-based discrimination, when it rejected the "Choose Life" specialty plate. *Id*. at 865.

Informed by the Supreme Court, our analysis of vanity plates in *Lewis*, and the analyses of specialty plates by our sister circuits, we now turn to the Missouri specialty license plate scheme to determine whether the messages on the plates are government or private speech. Our analysis boils down to one key question: whether, under all the circumstances, a reasonable and fully informed observer would consider the speaker to be the government or a private party. Notwithstanding the Sixth

Circuit's conclusion to the contrary, we now join the Fourth, Seventh and Ninth Circuits in concluding that a reasonable and fully informed observer would consider the speaker to be the organization that sponsors and the vehicle owner who displays the specialty license plate.

The primary purpose of Missouri's specialty plate program is to allow private organizations to promote their messages and raise money and to allow private individuals to support those organizations and their messages. As the Seventh Circuit noted, "[t]he plates serve as 'mobile billboards' for the organizations and like-minded vehicle owners to promote their causes and also are a lucrative source of funds." *Id.* at 863. Such a conclusion is consistent with our analogy between vanity plates and bumper stickers in *Lewis*. *See Lewis*, 253 F.3d at 1079 (noting that while "the state of Missouri technically owns the physical metal plate on which [the] message is displayed, . . . it occurs to us that a personalized plate is not so very different from a bumper sticker that expresses a social or political message"). Under the Missouri statute, both the state and the sponsoring organization exercise some degree of editorial control over the messages on specialty plates. While the Joint Committee retains the ultimate authority to approve or disapprove an application, it does so based solely on a general description of the plate provided by the sponsoring organization. Once the Joint Committee approves the application, the DOR must produce the specialty plate without further input from the Joint Committee or any other state actor. Thus, the organizations that sponsor the specialty plates and the vehicle owners who choose to purchase and display them are the literal speakers who bear the ultimate responsibility for the message.

With more than 200 specialty plates available to Missouri vehicle owners, a reasonable observer could not think that the State of Missouri communicates all of those messages. For example, Missouri offers specialty plates for the Knights of Columbus, which requires members to be practicing Catholics, for the Grand Lodge, which requires members to have a "belief in God," and for the Order of the Eastern

-13-

Star, which requires members to have a "belief in the existence of a Supreme Being." Yet a reasonable observer would not think that the State of Missouri has established the Catholic faith or that it has taken a position on the existence of God or a Supreme Being. Similarly, in *Lewis* we ordered the DOR to issue an "ARYAN-1" vanity plate. No reasonable observer would believe that the State of Missouri is endorsing white supremacy. Thus, the wide variety of available specialty plates further suggests that the messages on specialty plates communicate private speech.

Moreover, we note that the messages communicated through specialty plates are voluntary, not compulsory. While Missouri requires a vehicle to display a license plate, the State does not compel anyone to purchase a specialty plate. "Private individuals choose to spend additional money to obtain the plate and to display its pro-life messages on their vehicle." *Stanton*, 515 F.3d at 967 (quotation and alterations omitted). The sponsoring organization must apply for the specialty plate, and the vehicle owner must choose to purchase it. Because the "Choose Life" plate is different from the standard Missouri license plate, a reasonable observer would understand that the vehicle owner took the initiative to purchase the specialty plate and is voluntarily communicating his or her own message, not the message of the state.

Because the specialty plates bear sufficient indicia of private speech, we believe that under all the circumstances a reasonable and fully informed observer would recognize the message on the "Choose Life" specialty plate as the message of a private party, not the state. Therefore, we conclude that the messages communicated on specialty plates are private speech, not government speech.[3] *See also Robb v.*

---

[3]We do not think that the Supreme Court's recent *Summum* decision requires a different outcome. In that case, the Court held that privately-donated monuments in a city park communicate government speech. *Summum*, 129 S. Ct. at 1138. We deal here with a much different issue: whether specialty license plates on privately-owned vehicles communicate government speech. Unlike monuments displayed in

-14-

*Hungerbeeler*, 370 F.3d 735, 745 (8th Cir. 2004) (upholding the right of the Ku Klux Klan to participate in Missouri's Adopt-A-Highway program and explaining that the program's roadside signs communicate private speech because "[h]ighway adopters . . . participate in the program in large part so that they can express a particular message: their solidarity with the community and their wish to become known as promoters of clean highways. Although the signs are state owned, an adopter speaks through the signs by choosing to undertake the program's obligations in exchange for the signs' announcement to the community that it is a highway adopter.").[4]

Since we find that messages on specialty plates communicate private speech, we now turn to the issue of whether Missouri's specialty plate program is unconstitutional because it allows the State to engage in viewpoint discrimination. "[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship." *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988). "This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Id.* "[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *Id.* at 763-64.

---

public parks, specialty license plates that advertise the name or motto of a private organization facilitate expressive conduct on the part of the organization and its supporters, not the government.

[4]We would normally conduct a forum analysis at this point to determine whether license plates are traditional public forums, designated public forums, or nonpublic forums. *See, e.g.*, *White*, 547 F.3d at 864-65. However, because we find that the statute unconstitutionally failed to provide standards or guidelines to prevent viewpoint discrimination, we need not reach the issue. *See Lewis,* 253 F.3d at 1079 ("[W]e need not determine precisely what kind of forum, if any, a personalized license plate is because the statute at issue is unconstitutional whatever kind of forum a license plate might be.").

If Choose Life can prevail on a facial challenge, it need not prove, or even allege, that the Joint Committee denied the specialty plates based on Choose Life's viewpoint.[5] "[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance to prevent him from doing so." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992). In *Lewis*, for example, we declared a section of Missouri's vanity license plate law unconstitutional because it was so broad that "there was nothing in the ordinance to prevent the DOR from denying [the vehicle owner] the [vanity license] plate because of her viewpoint." *Lewis*, 253 F.3d at 1080. Similarly, section 21.795(6), which authorizes the Joint

[5]We note that the Supreme Court has expressed disfavor with facial challenges as they "often rest on speculation" and "raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Wash. State Grange v. Wash. State Republican Party*, 554 U.S. ---, 128 S. Ct. 1184, 1191 (2008) (internal quotation omitted). Facial challenges may also "run contrary to" the doctrine of judicial restraint and may "short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id*. At the same time, the Court continues to recognize the validity of facial challenges under the appropriate circumstances. *See Davis v. Fed. Election Comm'n*, 554 U.S. ---, 128 S. Ct. 2759, 2770 (2008). In the First Amendment context, "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange*, 128. S. Ct. at 1190 n.6 (internal quotations omitted). A facial challenge "should be applied only when there is 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'" *Milavetz, Gallop & Milavetz, P.A. v. United States*, 541 F.3d 785, 798 (8th Cir. 2008) (Colloton, J., concurring in part and dissenting in part) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)). Here, without *any* standards to channel the Joint Committee's discretion when approving or disapproving specialty plate applications, we think there is a realistic danger that the statute would significantly compromise First Amendment protections for a broad array of parties not currently before us. Therefore, we conclude that Choose Life's facial challenge is appropriate.

Committee to approve or deny specialty license plate applications, provides no standards or guidelines whatsoever to limit the unbridled discretion of the Joint Committee. *See* Mo. Rev. Stat. § 21.795(6) ("The committee shall also review for approval or denial all applications for the development of specialty plates submitted to it by the department of revenue. The committee shall approve such application by unanimous vote. The committee shall not approve any application if the committee receives a signed petition from five house members or two senators that they are opposed to the approval of the proposed license plate."). Consequently, the Joint Committee can deny an application for a specialty plate based solely on the organization's viewpoint.

The appellants concede that section 21.795(6) provides no guidelines for the members of the Joint Committee in reviewing specialty plate applications. They claim, however, that because the only voting members of the Joint Committee are legislators, not administrators or hired state employees, they are immune from suit. As the appellants note, "[t]here is no question that legislative bodies . . . are given immunity for statements and actions taken while performing legislative acts." *Fortner v. City of Archie*, 70 F. Supp. 2d 1028, 1029 (W.D. Mo. 1999). Legislative immunity was created to encourage legislators to serve their constituents without fear of arrest or civil proceedings. *Tenney v. Brandhove*, 341 U.S. 367, 372-73 (1951). However, "immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; the immunities officials enjoy when sued personally do not extend to instances where they are sued in their official capacities." *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) (internal quotation and alterations omitted); *see also Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immuity that the entity, *qua* entity, may possess . . . ."). Here, Choose Life filed suit against the members of the Joint Committee in their official capacities, not in their individual capacities. Accordingly, members of the Joint Committee cannot claim the personal defense of immunity. Because section

-17-

21.795(6) allows the Joint Committee unbridled discretion to determine who may speak based on the viewpoint of the speaker, we find that section 21.795(6) allows for viewpoint discrimination and is therefore unconstitutional.

Finally, the appellants argue that even if section 21.795(6) is unconstitutional, the district court abused its discretion in entering a permanent injunction requiring the DOR to issue the "Choose Life" specialty plates. In particular, the appellants contend that section 21.795(6) is so intertwined with the rest of the specialty plate statutory scheme that it is not severable, so that if section 21.795(6) is struck down, the rest of the specialty plate statutory scheme must fail as well. If the entire statutory scheme fails, then the DOR cannot issue any new specialty plates, including the "Choose Life" specialty plate.

We look to state law to determine the severability of a state statute. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 509-10 (1993). Under Missouri law, the "provisions of every statute are severable" unless a court, in striking down an unconstitutional provision, finds that the valid provisions, "standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." *See* Mo. Rev. Stat. § 1.140; *see also Trout v. State*, 231 S.W.3d 140, 147 (Mo. 2007).

The appellants point to the administrative procedures for obtaining a specialty plate set out in section 301.3150 to support their argument that section 21.795(6) is not severable from the rest of the specialty plate scheme. Section 21.795(6) specifically provides that the Joint Committee has the authority to review specialty license plate applications and must approve them by a unanimous vote. Without section 21.795(6), the appellants argue, there is no mechanism for approving new specialty plate applications because there is no longer any statutory approval process. Choose Life argues, however, that section 21.795(6) is severable from the rest of the

specialty plate scheme and that a sufficient statutory process remains in place to allow the issuance of the "Choose Life" plate.

Section 21.795 provides for the creation of the Joint Committee on Transportation Oversight and lists its duties, which include holding an annual meeting based on a report from the department of transportation; making recommendations to the state highways and transportation commission; holding semiannual meetings to discuss transportation department efficiencies, the presentation of a prioritized plan for all modes of transportation and other issues; and approving or denying specialty license plate applications. Even without section 21.795(6), the Joint Committee still meets on a regular basis, conducts business, oversees the transportation department and votes on "matter[s] within [its] duties." Section 21.795(1) allows the Joint Committee to approve matters "within the committee's duties" by a "concurrence of a majority vote of the [voting] members." Thus, the Joint Committee can still vote on specialty plate applications, which qualify as "matter[s] within [its] duties" under sections 21.795(1) and 301.3150(10). However, the remaining provisions limit what the Joint Committee can consider when it votes on specialty plate applications. The Joint Committee may still conduct the ministerial duties of determining whether the specialty plate applicant has provided the required list of two hundred individuals who plan to purchase the plate; whether the applicant has paid the fee, not to exceed five thousand dollars, to defray the cost of issuing, developing, and programming the implementation of the plate; and whether the applicant has the sponsorship of at least one member of the Missouri Legislature. Mo. Rev. Stat. § 301.3150(1). The Joint Committee can still review and approve or deny specialty plate applications based on the criteria provided in section 301.3150(1); it simply cannot deny an application based on the viewpoint of the speaker as it can under the current statutory scheme. Therefore, we find that sufficient statutory authority remains for the DOR to issue specialty license plates after receiving the approval of the Joint Committee. *See* Mo. Rev. Stat. § 301.3150(7) ("The department of revenue shall submit for approval all applications for the development of specialty plates to the [J]oint [C]ommittee . . .

-19-

during a regular session of the general assembly for approval."); § 301.3150(10) ("The department shall begin production and distribution of each new specialty license plate within one year after approval of the specialty license plate by the [J]oint [C]ommittee.").

Because section 21.795(6) is severable, the rest of section 21.795 and section 301.3150 remain intact, and we find that the district court did not commit legal error by entering a permanent injunction ordering Mitchell to issue the "Choose Life" specialty plates. Therefore, we hold that the district court did not abuse its discretion.

## III. CONCLUSION

Accordingly, we affirm the district court's grant of summary judgment and entry of a permanent injunction.

_____