Certiorari granted by Supreme Court, June 29, 2015
Vacated and Remanded by Supreme Court, June 29, 2015

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 13-1030

———————

AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA; DEAN
DEBNAM; CHRISTOPHER HEANEY; SUSAN HOLLIDAY, CNM, MSN; MARIA
MAGHER,

Plaintiffs - Appellees,

v.

ANTHONY J. TATA, in his official capacity as Secretary of
the North Carolina Department of Transportation; JAMES L.
FORTE, in his official capacity as Commissioner of the North
Carolina Division of Motor Vehicles,

Defendants – Appellants,

and

MICHAEL GILCHRIST, in his official capacity as Colonel of
the North Carolina State Highway Patrol,

Defendant.

------------------------

NATIONAL LEGAL FOUNDATION,

Amicus Supporting Appellants.

———————

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  James C. Fox, Senior
District Judge.  (5:11-cv-00470-F)

———————

Argued: October 30, 2013            Decided: February 11, 2014

———————

Before TRAXLER, Chief Judge, WYNN, Circuit Judge, and George L. RUSSELL, III, United States District Judge for the District of Maryland, sitting by designation.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Traxler and Judge Russell joined.

---

**ARGUED:** Kathryne Elizabeth Hathcock, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Christopher Anderson Brook, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Roy Cooper, North Carolina Attorney General, Neil Dalton, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, for Amicus Supporting Appellants.

---

WYNN, Circuit Judge:

The First Amendment prohibits the making of any law "abridging the freedom of speech . . . ." U.S. Const. amend. I. "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010). Chief amongst the evils the First Amendment prohibits are government "restrictions distinguishing among different speakers, allowing speech by some but not others." Id.

In this case, North Carolina seeks to do just that: privilege speech on one side of a hotly debated issue—reproductive choice—while silencing opposing voices. Specifically, though North Carolina invites citizens to "[m]ake a statement,"[1] and "promote themselves and/or their causes"[2] with specialty license plates, it limits this invitation to only those citizens who agree with North Carolina's "Choose Life" stance. North Carolina contends that it may so discriminate because specialty plate messages constitute pure government speech free from First Amendment viewpoint-neutrality constraints. With this, we cannot agree.

---

[1] http://www.ncdot.gov/dmv/vehicle/plates/.
[2] http://www.ncdot.gov/dmv/online/.

3

The Supreme Court and this Court have recognized individual speech interests in license plate messages. And in this case, too, the specialty plate speech at issue implicates private speech rights, and thus First Amendment protections apply. Because issuing a "Choose Life" specialty license plate while refusing to issue a pro-choice specialty plate constitutes blatant viewpoint discrimination squarely at odds with the First Amendment, we affirm the district court's grant of summary judgment and a permanent injunction in Plaintiffs' favor.

I.

In June 2011, the North Carolina General Assembly passed, and the North Carolina Governor signed into law, House Bill 289 ("HB 289"). The resulting law, "An Act to Authorize the Division of Motor Vehicles to Issue Various Special Registration Plates," authorizes the North Carolina Division of Motor Vehicles ("NC DMV") to issue, among other specialty license plates, a "Choose Life" plate. 2011 N.C. Sess. Laws 392.

By contrast, this law authorizes no pro-choice specialty license plate. Id. In fact, plates bearing slogans such as "Respect Choice" were suggested but repeatedly rejected by the North Carolina General Assembly. J.A. 61-62.

A "Choose Life" plate, like many other specialty license plates, costs a vehicle owner an additional $25 per year. N.C.

4

Gen. Stat. § 20-79.7(a1). Of the $25, $15 go to the Carolina Pregnancy Care Fellowship, a private organization that supports crisis pregnancy centers in North Carolina.[3] N.C. Gen. Stat. §§ 20-79.7(b), 20-81.12(b84). The remaining $10 go to the North Carolina Highway Fund, as is the case with other specialty plates. N.C. Gen. Stat. § 20-79.7(b). Further, the funds collected from "Choose Life" plates are expressly prohibited from "be[ing] distributed to any agency, organization, business, or other entity that provides, promotes, counsels, or refers for abortion . . . ." N.C. Gen. Stat. § 20-81.12(b84).

To develop a specialty license plate, NC DMV must receive three hundred applications from individuals interested in that plate. Id. Once the NC DMV issues the plate, any interested vehicle owner registered in North Carolina may purchase it. Over two hundred specialty plates are available, and North Carolina invites vehicle owners to "find the plate that fits you" and "[m]ake a statement with a specialized or personalized license plate." http://www.ncdot.gov/dmv/vehicle/plates/. According to North Carolina, its specialty plate program "allows citizens with common interests to promote themselves and/or their causes." http://www.ncdot.gov/dmv/online/.

---

[3] The Carolina Pregnancy Care Fellowship also serves as the official state contact for Choose Life, Inc., a national organization devoted to getting "Choose Life" license plates on the road in all fifty states.

5

Because North Carolina refused to allow a specialized plate to promote their cause, North Carolina vehicle owners who wanted a pro-choice specialty plate, along with the ACLU, brought this lawsuit in the United States District Court for the Eastern District of North Carolina. They sued the North Carolina Department of Transportation ("NC DOT") and the NC DMV (collectively called "North Carolina") for First and Fourteenth Amendment violations.

In December 2011, the district court granted a preliminary injunction blocking North Carolina from issuing the "Choose Life" plate. Am. Civil Liberties Union of N.C. v. Conti, 835 F. Supp. 2d 51 (E.D.N.C. 2011). One year later, in December 2012, the district court granted summary judgment and permanently enjoined the "Choose Life" plate. Am. Civil Liberties Union of N.C. v. Conti, 912 F. Supp. 2d 363 (E.D.N.C. 2012). The district court held, among other things, that "sufficient private speech interests are implicated by the specialty license plates to preclude a finding of purely government speech[,]" and that "the State's offering of a Choose Life license plate in the absence of a pro-choice plate constitutes viewpoint discrimination in violation of the First Amendment." Id. at 375. North Carolina appealed, and our review is de novo. Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786, 789 (4th Cir. 2004).

6

At the outset, we note that North Carolina does not deny that it engaged in viewpoint discrimination by approving the "Choose Life" plate while refusing to allow a pro-choice plate. Instead, North Carolina contends that it was free to discriminate based on viewpoint because the license plate speech at issue was solely its own. And under the government speech doctrine, when the government speaks for itself, it can say what it wishes. Plaintiffs disagree, arguing that the license plate speech at issue implicates private speech and all its attendant First Amendment protections, including the prohibition on viewpoint discrimination. Determining whether the "Choose Life" specialty plate embodies pure government speech or something else is therefore at the heart of this case.

A.

"Premised on mistrust of governmental power," Citizens United, 558 U.S. at 340, the First Amendment bars the government from abridging freedom of private speech. U.S. Const. amend. I; see also, Gitlow v. New York, 268 U.S. 652 (1925) (incorporating the freedom of speech against the states). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over

7

another. Discrimination against speech because of its message is presumed to be unconstitutional." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995) (citations omitted).

"[T]he violation of the First Amendment is all the more blatant" when the government targets not simply subject matter, but particular viewpoints speakers take on a subject. Id. at 829. Indeed, the Supreme Court has called viewpoint discrimination "an egregious form of content discrimination" and has held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. at 829.

By contrast, if the government engages in its own expressive conduct, then the Free Speech Clause and its viewpoint neutrality requirements have "no application." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009). Indeed, under the "relatively new, and correspondingly imprecise" government speech doctrine, Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 574 (2005) (Souter, J., dissenting), "[a] government entity has the right to speak for itself. It is entitled to say what it wishes, and to select the views that it wants to express." (quotation marks, citations, and alterations omitted).

Although the Supreme Court has not yet recognized that speech may be not purely government or private but instead implicate both, this Court has. In Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commissioner of the Virginia Department of Motor Vehicles ("SCV I"), this Court held that Virginia's barring the Sons of Confederate Veterans from obtaining a specialty license plate with a confederate flag logo constituted unconstitutional viewpoint discrimination. 288 F.3d 610 (4th Cir. 2002). While the panel opinion deemed the speech at issue private only, Judge Luttig, in a separate opinion regarding the denial of rehearing en banc, presciently recognized that "speech in fact can be, at once, that of a private individual and the government." Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles ("SCV II"), 305 F.3d 241, 245 (4th Cir. 2002) (Luttig, J.). He noted that specialty plates were perhaps the "quintessential example of speech that is both private and governmental because the forum and the message are essentially inseparable, the consequence being that it is difficult if not impossible to separate sufficiently what is indisputably the speech act by the private speaker from what is equally indisputably the speech act by the government." Id.

Two years later, in Rose, this Court embraced the notion of mixed speech. 361 F.3d at 794.[4] In Rose, a case strikingly similar to this one, South Carolina had authorized the issuance of a "Choose Life" specialty license plate but no plate bearing a pro-choice message. Id. at 787–88. The plaintiffs in Rose, as here, alleged that in doing so, the state engaged in unconstitutional viewpoint discrimination. Id. Deeming the specialty plate speech at issue mixed speech implicating private speech rights, we agreed. Id. We held that the speech at issue there "appears to be neither purely government speech nor purely private speech, but a mixture of the two." Id. at 794. We applied a forum analysis, which the Supreme Court has instructed courts to use when private speech occurs on government property, noted that the government may not viewpoint-discriminate in any forum, and held that South Carolina's allowing a pro-life plate but no pro-choice plate constituted viewpoint discrimination in violation of the First Amendment. Id. at 795-99.

_____

[4] While each member of the Rose panel wrote a separate concurring opinion, Judge Michael authored the only opinion laying out the Court's analytical framework, and the other panel members, Judge Luttig and Judge Gregory, essentially embraced it. See, e.g., Rose, 361 F.3d at 800 (Luttig, J.) ("Needless to say, I am pleased that the court adopts today the view that speech can indeed be hybrid in character."); Rose, 361 F.3d at 801 (Gregory, J.) ("[B]ecause I believe the judgment reached today applies the factors set forth in Sons of Confederate Veterans in a manner that begins to recognize the government speech interests in the vanity license plate forum, I concur in the judgment.").

10

B.

To determine whether speech is that of the government, private parties, or both, this Court looks to "instructive" factors laid out in SCV I:

(1) "the central purpose of the program in which the speech in question occurs;"

(2) "the degree of editorial control exercised by the government or private entities over the content of the speech;"

(3) "the identity of the literal speaker;" and

(4) "whether the government or the private entity bears the ultimate responsibility for the content of the speech[.]"

288 F.3d at 618 (quotation marks omitted).

North Carolina argues that this Court abandoned the SCV factors with Page v. Lexington County School District One, 531 F.3d 275 (4th Cir. 2008). According to North Carolina, in Page we lopped off several of the SCV factors in favor of an exclusive focus on control of the message in question to determine whose message it is. We disagree.

First, we note that "a panel of this court cannot over-rule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that." United States v. Brooks, 524 F.3d 549, 559 n.17 (4th Cir. 2008) (quotation marks omitted). Page,

11

which is neither a Supreme Court nor an en banc decision, thus did not supplant SCV I.

Second, Page does not suggest any attempt to overthrow the SCV factors in favor of a single-factor control test. Instead, in Page, a case about a school district's speech, we cited to, and considered, several factors—specifically, who disseminates the speech, as well as who "establishes" and "controls" the speech. Page, 531 F.3d at 281. Our flexible approach in Page is not surprising, given our express acknowledgment in SCV I itself that the four factors identified there are "instructive" but neither "exhaustive" nor always uniformly applicable. SCV I, 288 F.3d at 619. Therefore even Page does not support our having embraced a single-factor approach to determining who is speaking.

Further, in opinions postdating Page, we explicitly employed the SCV factors to identify the pertinent speaker. See, e.g., Turner v. City Council of City of Fredericksburg, Va., 534 F.3d 352, 354 (4th Cir. 2008) (noting that the "Fourth Circuit has adopted a four-factor test for determining when speech can be attributed to the government," listing the SCV factors, and "[a]pplying these factors, . . . [to] conclude that the legislative prayer at issue . . . is governmental speech"). Clearly, then, this Circuit has not recognized Page as having displaced SCV I.

12

North Carolina nonetheless presses that the Supreme Court implicitly overruled our SCV test with Johanns, 544 U.S. 550, and Summum, 555 U.S. 460. Specifically, North Carolina contends that those cases instruct us to consider only "the level of control the government exercises over the speech, not on who a reasonable observer views as the literal speaker." Appellants' Br. at 7. Again, we disagree with North Carolina's argument and thus decline its invitation to "follow the 'control' test for government speech set forth in Johanns and affirmed in Summum." Id. at 14.

Looking first at Johanns, we agree with the Ninth Circuit that the case is factually distinguishable from specialty license plate cases. "Johanns involved a government-compelled subsidy of government speech. . . . In Johanns, the individual harm was being forced to give the government money to pay for someone else's message." Ariz. Life Coal. Inc. v. Stanton, 515 F.3d 956, 964 (9th Cir. 2008) (quotation marks omitted). In specialty license plate cases, by contrast, "private individuals choose to pay the price for obtaining a particular specialty license plate. The First Amendment harm is being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum." Id. (quotation marks omitted).

13

Further, the Supreme Court itself limited its holding to compelled subsidies, expressly declining to address as not on point even compelled speech arguments. Johanns, 544 U.S. at 564-65.[5] While doing so, the Supreme Court recognized the continued validity of Wooley v. Maynard, in which the Court held that vehicle owners had a First Amendment right to cover the "Live Free or Die" state motto on their New Hampshire license plates. Johanns, 544 U.S. at 565 n.8 (citing and distinguishing Wooley, 430 U.S. 705 (1977)). The Supreme Court also recognized the continued validity of West Virginia State Board of Education v. Barnette, in which the Court held a law requiring all schoolchildren to recite the Pledge of Allegiance and salute the American flag unconstitutional under the First Amendment. Johanns, 544 U.S. at 565 n.8 (citing and distinguishing Barnette, 319 U.S. 624 (1943)). Yet if North Carolina were correct in its assertion that government control of the message is all that matters, both Wooley and Barnette would have been

_____

[5] We recognize that, upon closer consideration, government subsidies may look more like government regulation than courts have generally been willing to admit. See, e.g., Joseph Blocher, Viewpoint Neutrality and Government Speech, 52 B.C. L. Rev. 695, 721 (2011) (noting, among other things, that funding one group effectively singles out disfavored, unsubsidized groups and thus looks like viewpoint-based regulation). We do not resolve that quandary here. We simply conclude that Johanns did not overrule the four-factor framework this Court established in SCV I and has applied repeatedly since to determine who is speaking in cases like this one.

14

wrongly decided—and they surely would not have been cited in Johanns as good compelled speech law.

Indeed, Summum underscores that the Supreme Court did not espouse a myopic "control test" in Johanns. Specifically, in Summum, the Supreme Court held that placement of permanent monuments, including those designed and donated by private entities, in a city park constitutes government speech. 555 U.S. at 481. As in Johanns, the Supreme Court considered the "control" factor, observing that the city "'effectively controlled' the messages sent by the monuments in the [p]ark by exercising 'final approval authority' over their selection." Summum, 555 U.S. at 473 (quoting Johanns, 544 U.S. at 560–61).

Importantly, however, the Supreme Court also focused on the perceived identity of the speaker. The Court noted that monuments installed on property are "routinely—and reasonably—interpret[ed] as conveying some message on the property owner's behalf." Id. at 471. Accordingly, the Court concluded that "there is little chance that observers will fail to appreciate the identity of the speaker" as the property owner. Id.

Additionally, context mattered in Summum. The Supreme Court focused on the fact that "public parks can accommodate only a limited number of permanent monuments." Id. at 478. As the Court noted, "[s]peakers, no matter how long-winded, eventually come to the end of their remarks[,]" while "monuments

15

. . . endure." Id. at 479. We cannot square the Supreme Court's multi-faceted, context-specific reasoning in Summum with North Carolina's blanket contention that all that matters is who controls the message.[6]

The third Supreme Court case upon which North Carolina seeks to rely—Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston—has absolutely no bearing on this one. 515 U.S. 557 (1995). North Carolina cites to Hurley for the proposition that "[u]nder the government speech doctrine, North Carolina can claim the 'fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.'" Appellants' Br. at 4 (quoting Hurley, 515 U.S. at 573). But Hurley had nothing to do with the government speech doctrine—which, by its very nature, does not implicate the First Amendment. See, e.g., Summum, 555 U.S. at 467-68 (noting that if the government engages in its "own expressive conduct, then the Free Speech Clause has no application" because "it does not regulate government speech"). Instead, that case centered on private parties' free speech rights, holding that requiring private parade organizers to include amongst their

---

[6] The Supreme Court also noted "the legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint." Summum, 555 U.S. at 473. We do not take this concern lightly.

16

marchers a group whose message they opposed violated the organizers' First Amendment rights.  Hurley, 515 U.S. at 559. If anything, Hurley hurts North Carolina's cause, not least due to its recognition that government regulation may not "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government."  Id. at 579.

In sum, for over a decade, this Circuit has found the SCV factors instructive in determining whether speech is that of the government, private parties, or both.  Sometimes considering those factors has led us to conclude that speech implicated both government and private expression.  See, e.g., WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 299-300 (4th Cir. 2009); Rose, 361 F.3d at 794.  In other cases, considering the SCV factors led to the conclusion that the speech at issue was purely government (see, e.g., Turner, 534 F.3d at 354) or purely private (see SCV I, 288 F.3d at 621). But regardless of our conclusion in any particular case, we have repeatedly looked to the SCV factors to help us identify the pertinent speaker.  And neither an en banc decision from this Court, nor one from the Supreme Court, has implicitly, much less explicitly, suggested that to do so was to err.

C.

Having concluded that the "instructive" factors we identified in SCV remain appropriate tools for evaluating whether speech is government, private, or both, we turn to applying those factors here.

1.    The Central Purpose Of The Program In Which The Speech In Question Occurs

The first SCV factor, the central purpose of the program in which the speech in question occurs, may—or may not—be readily apparent.  SCV I, 288 F.3d at 619.  To divine the central purpose, this Court has considered, e.g., revenue generation and allocation and legislative intent.  See, e.g., id.; Rose, 361 F.3d at 793.

Here, we must conclude that the purpose of the specialty license plate program, including the "Choose Life" plate, is to allow North Carolina drivers to express their affinity for various special interests, as well as to raise revenue for the state.[7]  First, the legislative history of HB 289 indicates that

---

[7] In his Rose opinion, Judge Michael focused exclusively on the "Choose Life" specialty plate and its authorizing legislation, rather than on South Carolina's specialty plate program more broadly.  That narrow focus does not square with SCV I's instruction to look to the central purpose "of the program in which the speech in question occurs."  SCV I, 288 F.3d at 618 (emphasis added).  See also Am. Civil Liberties Union of Tenn. v. Bredesen, 441 F.3d 370, 389-90 (6th Cir. 2006) (Martin, J., dissenting) ("If we think of each individual license plate in a vacuum, each one can be reasonably (Continued)

18

the specialty license plate program was intended to be a forum for private expression of interests. See, e.g., Remark of Representative Tim Moore to the North Carolina House Fin. Comm. (June 2, 2011), J.A. 19 ¶ 33 (stating that specialty license plates constitute "voluntary speech that people are making by purchasing the license plate"). Fittingly, then, North Carolina expressly invites its vehicle owners to "[m]ake a statement with a specialized or personalized license plate" and to "find the plate that fits you." http://www.ncdot.gov/dmv/vehicle/plates/. It describes its specialty plate program as "allow[ing] citizens with common interests to promote themselves and/or their causes." http://www.ncdot.gov/dmv/online/. By contrast, nothing before us suggests that North Carolina has ever communicated to the public that the specialty plate program is

---

characterized as a government message. But, in order to properly characterize the specialty license plate program for First Amendment purposes, we cannot view each license plate in isolation. I suggest that when opening one's eyes to the license plate program as a whole, it is evident that the government has created a program to encourage a diversity of views and messages from private speakers."). Even were we to focus on the authorizing legislation alone, as did Judge Michael, the North Carolina law at issue here authorized a wide array of specialty plates, on topics ranging from wild turkeys to stock car racing. We therefore could not conclude here that the purpose of the authorizing law "is specifically to promote the expression of a pro-life viewpoint[,]" as opposed to legislation "allowing . . . for the private expression of various views[.]" Rose, 361 F.3d at 793 (quotation marks and citation omitted).

government-only speech or that it seeks volunteers to help disseminate a government-only message.

The specialty license plate program also has a significant revenue-raising component. The NC DMV is authorized to develop a specialty license plate only after it has received three hundred applications from North Carolina drivers interested in the plate. N.C. Gen. Stat. § 20-81.12(b84). The specialty plate costs a vehicle owner an additional $25 per year. N.C. Gen. Stat. § 20-79.7. And $10 of that annual fee go to the North Carolina Highway Fund. Id. As we noted in SCV I:

> If the General Assembly intends to speak, it is curious that it requires the guaranteed collection of a designated amount of money from private persons before its 'speech' is triggered. It is not the case, in other words, that the special plate program only incidentally produces revenue for the [government]. The very structure of the program ensures that only special plate messages popular enough among private individuals to produce a certain amount of revenue will be expressed.

SCV I, 288 F.3d at 620 (footnote omitted).

Finally, the large number and wide array of specialty plates also weigh in favor of private speech. North Carolina drivers may choose from over two hundred specialty plates. And the subjects of those plates range from the controversial (Sons of Confederate Veterans, whose confederate flag logo many "view to be a symbol of racism and slavery," Rose, 361 F.3d at 801 (Gregory, J., concurring)), to the religious (Knights of

20

Columbus, a civic organization "which requires members to be practicing Catholics," Roach v. Stouffer, 560 F.3d 860, 868 (8th Cir. 2009)), to the seemingly irrelevant to any conceivable North Carolina government interest (e.g., out-of-state universities). It defies logic, and may in fact create other problems (such as Establishment Clause issues in the case of the Knights of Columbus) to suggest that all of these plates constitute North Carolina's—and only North Carolina's—message.

In sum, the first SCV factor, the central purpose of the program in which the speech in question occurs, weighs in favor of finding the speech at issue here private.

2. The Degree Of Editorial Control Exercised By The Government Or Private Party Over The Content

The second factor, "the degree of editorial control exercised by the government or private entities over the content of the speech," weighs in favor of the government. The legislature determined, and the governor approved, the "Choose Life" message. 2011 N.C. Sess. Laws 392 ("The plate shall bear the phrase 'Choose Life.'"). And the parties themselves agree that "complete editorial control" rests with North Carolina. Appellees' Br. at 12.

3. The Identity Of The Literal Speaker

The third SCV factor, the identity of the literal speaker, weighs in favor of private speech. In coming to that

21

conclusion, we first consider Wooley, in which the Supreme Court held that New Hampshire residents had a First Amendment right to cover the "Live Free Or Die" state motto on the standard state license plate. 430 U.S. 705. Significantly, the Supreme Court there declared that New Hampshire's citizens found themselves "faced with a state measure" that "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." Id. at 715 (quotation marks omitted). In other words, the Supreme Court deemed license plates a sphere of private "intellect and spirit" that "implicat[es] First Amendment protections" from government control. Id.[8]

Moreover, any argument that the state alone is the literal speaker is substantially weaker here than it was in Wooley. In Wooley, the slogan at issue was the state motto, and it appeared on all non-commercial New Hampshire plates, "a fact presumably apparent to anyone driving in New Hampshire." SCV II, 305 F.3d at 244 (Williams, J.). "A fortiori must it be the case that

_____

[8] North Carolina suggests that Wooley—which predates the Supreme Court's recognition of the government speech doctrine and the "control test" North Carolina contends flows from Johanns and Summum—is no longer good law. Yet that contention flies in the face of Johanns itself, in which the Supreme Court majority recognized the continued validity of, and distinguished, Wooley. Johanns, 544 U.S. at 565 n.8. Clearly, the Supreme Court did not view Wooley as passé. Neither do we.

22

speech placed on a license plate by the government for a fee at the request of a private organization or individual is at a minimum *partly* the private speech of that organization or individual." Id. at 246 (Luttig, J.).

Indeed, to any reasonable observer, the literal speaker of a message on a specialty plate that the observer knows the vehicle owner selected is surely the vehicle owner. Messages on some specialty license plates, such as the dance plate "**I**'d Rather Be Shaggin," N.C. Gen. Stat. 20-79.4(b)(203) (emphasis added), or the plate depicting a dog and cat and stating "**I** care," N.C. Gen. Stat. 20-79.4(b)(12) (emphasis added), make the connection explicit.

We do not deny that specialty license plates are state property. Nor do we deny that even specialty plates, which must be authorized by state law, to some extent bear North Carolina's imprimatur. Nevertheless, the copious specialty license plates, including "Choose Life," available to North Carolina drivers constitute "voluntary speech that people are making . . . ." Remark of Representative Tim Moore to the North Carolina House Fin. Comm. (June 2, 2011), J.A. 19 ¶ 33. Specialty plates are closely associated with the drivers who select and pay for them. And the driver, on whose car the special message constantly appears for all those who share the road to see, is the ultimate

communicator. The third factor, the identity of the literal speaker, thus weighs in favor of private speech.

### 4. Whether The Government Or The Private Party Bears Ultimate Responsibility For The Speech's Content

Finally, we must conclude that the fourth factor, the ultimate responsibility for the speech, weighs in favor of private speech. "When a special license plate is purchased, it is really the private citizen who engages the government to publish *his* message," not the other way around. SCV II, 305 F.3d at 246 (Luttig, J.). Indeed "'but for'" the private individual's action, the specialty license plate would never exist. Id. North Carolina drivers must apply for the specialty plate, which is issued only after at least three hundred seek the plate. Further, those private individuals must pay for the specialty plate "over and above the cost exacted for a standard license plate." Id.

In sum, applying SCV's instructive factors to the facts at hand, we conclude that three of the four factors indicate that the specialty plate speech at issue is private, while one suggests that the specialty plate speech is government. In other words, we agree with the district court "that sufficient private speech interests are implicated by the specialty license plates to preclude a finding of purely government speech." Conti, 912 F. Supp. 2d at 375.

24

Our conclusion is in line with those reached by our Sister Circuits in similar cases. With only one exception, all Circuits to have addressed the issue have held that specialty license plates implicate private speech rights and cannot properly be characterized as solely government speech. Roach, 560 F.3d 860; Stanton, 515 F.3d 956; Choose Life Ill., Inc. v. White, 547 F.3d 853 (7th Cir. 2008); Women's Emergency Network v. Bush, 323 F.3d 937 (11th Cir. 2003); cf. Perry v. McDonald, 280 F.3d 159 (2d Cir. 2001). The sole outlier, the Sixth Circuit, held in Bredesen that Tennessee's "Choose Life" specialty plate constituted pure government speech. 441 F.3d 370. For the many reasons discussed above, we must agree with the Seventh Circuit that "this conclusion is flawed . . . ." White, 547 F.3d at 863. We have no hesitation in holding that the "Choose Life" plate at issue here implicates private speech rights and cannot correctly be characterized as pure government speech.

D.

On appeal, North Carolina argues only that because its specialty plates are government speech, North Carolina can viewpoint-discriminate free from First Amendment constraints. North Carolina did not argue, for example, that even if we were to deem specialty plates mixed speech, North Carolina still wins. North Carolina did not challenge in any way the district

25

court's conclusion that, upon finding private speech rights implicated, "the State's offering of a Choose Life license plate in the absence of a pro-choice plate constitutes viewpoint discrimination in violation of the First Amendment." Conti, 912 F. Supp. 2d at 375. That conclusion, which is supported by Rose, therefore stands. See Rose, 361 F.3d at 799 ("By limiting access to a specialty license plate to those who agree with its pro-life position, the State has distorted the forum in favor of its own viewpoint. This it may not do.").

North Carolina nevertheless laments that if it has created a forum, it "must allow all viewpoints to be heard via specialty plates." Appellants' Br. at 30. This complaint seems at odds with North Carolina's contention that its vast array of specialty plates "celebrat[es]" the "diversity of its citizen's interests . . . ." Id. at 18, 41. Apparently, North Carolina wishes to celebrate only some interests of some of its citizens—namely those with which it agrees. This, it may not do.

North Carolina then sounds the death knell for specialty plates, predicting a "flood" of "Kill The Sea Turtles" and "Children Last" plates that will force it to end its specialty plate program. Appellants' Br. at 27-29. Melodrama aside, our ruling today "does not render [North] Carolina powerless to regulate its specialty license plate forum." Rose, 361 F.3d at 799. But it must do so in a viewpoint-neutral fashion—which it

26

already does, to some extent, by requiring three hundred applicants before issuing a new specialty plate. Surely such a requirement can filter out "frivolous license plate proposals" and prevent the roads from being inundated with "license plates advocating reckless pet breeding." Bredesen, 441 F.3d at 391 (Martin, J., dissenting).

Another alternative: North Carolina can choose to avoid the reproductive choice debate altogether. Illinois, for example, "excluded the entire subject of abortion from its specialty-plate program." White, 547 F.3d at 865. The Seventh Circuit upheld that viewpoint-neutral restriction, noting that "the State has effectively imposed a restriction on access to the specialty-plate forum based on subject matter: no plates on the topic of abortion. It has not disfavored any particular perspective or favored one perspective over another on that subject; instead, the restriction is viewpoint neutral." Id. at 866. But see Stanton, 515 F.3d 956. After all, "[i]t is one thing for states to use license plates to celebrate birds and butterflies . . . . It is quite another for the state to privilege private speech on one side-and one side only-of a fundamental moral, religious, or political controversy." Planned Parenthood Of S.C. Inc. v. Rose, 373 F.3d 580, 581 (4th Cir. 2004) (Wilkinson, J., voting to deny rehearing en banc).

## III.

In sum, North Carolina invites its vehicle owners to "[m]ake a statement" and "promote themselves"—but only if they are on the government's side of a highly divisive political issue. This, North Carolina may not do. Because the specialty plate speech at issue implicates private speech rights and is not pure government speech, North Carolina's authorizing a "Choose Life" plate while refusing to authorize a pro-choice plate constitutes viewpoint discrimination in violation of the First Amendment.

AFFIRMED